Sherman v. White.

a

62  271
168s 589

## Francis T. Sherman et al. vs. Catherine M. White.

1. TRUSTEES—*Temporary Investment of Trust Funds.*—Investments in speculative railroad stocks are not within the limit of any correct rule within which equity will require a trustee to keep, with reference to the character of securities, in which he may make temporary investments of unemployed trust funds.

2. SAME—*Not to Make Personal Gains.*—A trustee may sometimes, under peculiar circumstances, and in an open manner, be entitled to make a personal gain to himself out of the trust property, when not done at the expense of his trust, but such instances are rare and exceptional.

3. SAME—*To be Disinterested.*—The discretion of a trustee in the matter of determining upon the amount of insurance upon large properties belonging to the trust estate, ought to be freed absolutely from every element which might possibly have a tendency to induce him to take into account his individual gain. He can not occupy the dual capacity of trustee and insurance agent.

4. SAME—*To Account to the Estate for Commissions Received.*—Where a trustee, whose compensation is fixed by the will creating the trust, by joining an underwriters' association, became entitled to receive a commission upon premiums paid by him for insurance upon the property held by him in trust, it was held that the commissions so received by him belonged to the estate.

5. ACQUIESCENCE—*By a Cestui Que Trust.*—To bind a cestui que trust, by acquiescence in the acts of a trustee, it is necessary that there should be a free disclosure, by the trustee, of every circumstance material to be known. The cestui que trust can not be said to acquiesce in what he does not know, nor can he be bound by acquiescence unless he is fully apprised of his rights.

6. SAME—*Burden of Proof.*—The proof of knowledge of the facts relied upon to establish the acquiescense must be made by the party who relies upon it as a defense.

**Bill for an Accounting.**—Appeal from the Circuit Court of Cook County. The Hon. ELBRIDGE HANECY, Judge, presiding. Heard in this court at the October term, 1895. Affirmed in part, reversed in part and remanded, with directions. Opinion filed January 22, 1896.

BAYLEY & WEBSTER, attorneys for appellants.

The investment of trust funds by a trustee in speculative securities constitutes a breach of trust, and the trustee is liable for the loss thereby occasioned.

The law does not give to trustees the same freedom of choice in investments which may be exercised by prudent business men in their own affairs. It is the settled rule in equity, in the absence of express directions in the instrument creating the trust, or of statutory permission, that trustees can not invest trust property upon any mere personal security, nor upon the stocks, bonds, or other securities of private business corporations. In England, the rule of equity is, that the trustee should invest trust funds, and can only escape risk and liability by investing in real estate securities, or in the public governmental securities of the British government. In the United States, while the rules are certainly not so stringent and invariable as in England, and while different regulations may prevail to some extent in different States, based partly upon statutory legislation, and partly upon the policy of encouraging local enterprises, the same fundamental principle of requiring permanent investments in real estate or governmental. securities is generally recognized by the courts; at least all speculative risks are forbidden. Pomeroy, Eq. Jur., Sec. 1070, *et seq.;* Perry on Trusts, Secs. 452, 454, 456, 459; Mattocks v. Moulton, 84 Me. 545; Adair v. Bremmer, 74 N. Y. 539; King v. Talbot, 40 N. Y. 76; Simmons v. Oliver, 74 Wis. 633; 2 Story's Eq. Jur., Secs. 1273, 1278.

When a trustee has in fact converted trust funds to his own use, or without authority has invested the trust funds in any other property into which such funds can be distinctly traced, the *cestui que trust* has his election either to follow the same into the new investment, or to hold the trustee personally liable for the breach of trust. Perry on Trusts, Sec. 470-1 ; Oliver v. Pratt, 3 How. (U. S.), 332 ; Breit v. Yeaton, 101 Ill. 242 ; 2 Story's Eq. Jur., Sec. 1262 ; 11 Am. & Eng. Enc. of Law, 837, n. 2.

The *cestui que trust*, in such cases, has the right to have the trust attach to the property so purchased with trust

funds, or he may repudiate the trust, and disclaim any title to the property, and proceed upon any other remedies he is entitled to, either *in rem* or *in personam*.    Breit v. Yeaton, 101 Ill. 242.

Conduct in relation to the trust property, which is fraudulent in its nature or tendency, is deemed to be the individual conduct of the trustee; its consequences, if injurious, are imputed to him personally, and his own estate will be held therefor.    27 Am. & Eng. Ency. 193.

It is important, too, to observe the distinction in respect to the trustee's liability, between a trustee whose control of the property is absolute and one who is the mere repository of the legal title.    One who is in possession is held to a strict accountability.    27 Am. & Eng. Ency. 194.

The trustee is liable for trust money lost while mingled with his own, no matter how or by what cause the loss occurs.    He may have used the utmost care and prudence in conducting the business, and the loss may have been the result of unforeseen, inevitable accident; he is still liable, since he is engaged in a positive violation of duty.    2 Pomeroy's Eq. Jur., Sec. 1076, n. 1 ; 2 Story's Eq. (12th Ed.) Sec. 1262.

If a deposit is made in such a manner as on the face of the books of the bank in which the deposit is made, to authorize the trustee, his assignee or legal representative, to claim it as the fund of the depositor, the *cestui que trust* has the option to do likewise.    Naltner v. Dolan, 108 Ind. 500; Merket v. Smith, 33 Kan. 66 ; McAllister v. Commonwealth, 30 Pa. St. 536 ; Morris v. Wallace, 3 Pa. St. 319 ; Jackson v. Bank, 10 Pa. St. 61; School Dist. v. Bank, 102 Mass. 174; Utica Ins. Co. v. Lynch, 11 Paige, 520; Bartlett v. Hamilton, 46 Me. 435; 2 Pomeroy's Eq. Jur., Secs. 1067–1076; Perry on Trusts, Secs. 442–4 ; Story on Agency, Sec. 108.

No such acquiescence as will work an estoppel in such cases, is shown by the evidence.

A man can not be bound by acquiescence unless he is fully apprised as to his rights and all the material facts and circumstances of the case.    Bisham's Hill on Trustees.

Nor, indeed, is a recognition of avail, which assumes the validity of a transaction, if the question as to its validity does not appear to have come before the parties.    The proof of knowledge lies on the party who alleges acquiescence and sets it up as a defense.    Id., 301.

Mere neglect to sue for a few years, without other acquiescence, is not a bar.    1 Perry on Trusts, Sec. 850, citing, Henchett v. Briscoe, 22 Beav. 496.

The *cestui que trust* must be shown to have been apprised of his legal rights in order to bind him by ratification.    2 Pomeroy's Eq. Jur., Sec. 1083 n.    Adair v. Bremmer, 74 N. Y. 554.

The trustee must see to it that all the *cestuis que trust* concur in order to protect him from a breach of trust.    1 Perry on Trusts, Sec. 285.

No principle of equity is better settled than that a trustee must account for all profits which may come to him by dealing with the trust property, even for bonuses or gratuities given him by strangers, for contracts made with them in relation to the trust property.    1 Perry on Trusts, Sec. 209.

In the execution of the trust, duty and interest must not be allowed to come into conflict.    Nor will any opportunity for conflict be permitted.    The trustee is forbidden to reap any personal advantage from his position, or deal with the trust property for his own benefit.    27 Am. & Eng. Ency. 194.

Absolute and most scrupulous good faith is the very essence of the trustee's obligation.    The first and principal duty arising from this fiduciary relation is to act in all matters of the trust wholly for the benefit of the beneficiary.    The trustee is not permitted to manage the affairs of the trust, or to deal with the trust property, so as to gain any advantage directly or indirectly, for himself, beyond his lawful compensation.    It is imperative upon the trustee in his dealings with trust property not to use it in his private business, not to make any incidental profits for himself in its management, and not to gain any pecuniary gains

from his fiduciary position.   Pomeroy Eq. Jur., Sec. 1075. A trustee receiving gifts from the tenants of his estate should be punished more severely than simply by being compelled to give up the sums he has received.   Jacobus v. Munn, 38 N. J. Eq. 622.

It is familiar law, founded in wisdom and sound policy, that any advantage gained by an agent, whether it is the fruit of performence or violation of duty, belongs to his principal.   Dodd v. Wakeman, 26 N. J. Eq. 487; Story on Agency, Secs. 207–211.

Harvey B. Hurd, attorney for appellee, contended that whatever may be the law with reference to the kind of security a trustee may invest in, when there is no direction by the creator of the trust or by the court, there can be no doubt, if the trustee pursues the directions of the beneficiaries, or they ratify or acquiesce in his acts, they can not be heard in a court of equity to complain.   As the appellee puts her defense upon the ground of acquiescence, which she thinks she has most conclusively shown, we shall confine ourselves to the consideration of the authorities on that point.

A beneficiary, who, subsequently to a breach of trust, acquiesces in it, can not maintain a suit for relief against those who would otherwise have been liable.   The acquiescence, in order to produce this effect, must take place with full information by the beneficiary of all the facts, and with full knowledge of his legal rights arising from these facts; in short, it must have all the requisites of an acquiescence heretofore described to defeat the liability of a defaulting fiduciary. Pomeroy's Eq. Jur., Secs. 1082, 1083.

While confirmation implies a deliberate act intended to renew and ratify a transaction known to be voidable, acquiescence is some act, not deliberately intended to ratify a former transaction as existing, and intended in some extent at least to carry it into effect, and to obtain or claim the benefits resulting from it.   The theory of the doctrine is that a party having thus recognized a contract as existing, and having done something to carry it into effect and to obtain or claim

its benefits, although perhaps only to a partial extent, and
having thus taken his chances, can not afterward be suffered
to repudiate the transaction and allege its voidable nature.
It follows that mere delay, mere suffering time to elapse
without doing anything, is not acquiescence, although it
may be, and often is, strong evidence of an acquiescence,
and it may be, and often is, a distinct ground for refusing
equitable relief, either affirmative or defensive.

As acquiescence is thus a recognition of and consent to
the contract or other transaction as existing, the requisites
to its being effective as a bar, are knowledge or notice of
the transaction itself, knowledge of the party's own rights,
absence of all undue influence or restraint, and consequent
freedom of action. A conscious intention to ratify the trans-
action, however, is not an essential element. When a party
with full knowledge, or at least with sufficient notice or
means of knowledge of his rights, and of all the material
facts, freely does what amounts to a recognition of the trans-
action as existing, or acts in a manner inconsistent with its
repudiation, or lies by for a considerable time and know-
ingly permits the other party to deal with the subject-mat-
ter, under the belief that the transaction has been recog-
nized, or freely abstains for a considerable time from
impeaching it, etc., that the other party is thereby reasona-
bly induced to suppose that it is recognized, there is acquies-
cence, and the transaction, although originally impeachable,
becomes unimpeachable in equity, even where there has been
no act nor language properly amounting to an acquiescence.
A mere delay, a mere suffering time to elapse unreasonably,
may, of itself, be a reason why courts of equity refuse to
exercise their jurisdiction in cases of actual and constructive
fraud, as well as in other instances. It has always been a
principle of equity to discourage stale demands. *Laches* is
often a defense wholly independent of the statute of limita-
tions. Pomeroy's Eq. Jur., Sec. 965. Kerr on Fraud and
Mistake, 299–301; Seley v. Rhoads, 1 Bligh's Ch. N. R. 1;
Fuller v. Melrose, 1 Allen, 166; Tash v. Adams, 10 Cush.
252; Langford v. Stokes, 11 Ves. 319; Montfort v. Cada-
gan, 17 Ves. 489; Nail v. Punter, 5 Sim. 555.

Sherman v. White.

Unauthorized investments do not *ipso facto* render the trustee personally liable, when no loss ensues.  *  *  .* It should be carefully observed in this connection, that if the beneficiary is *sui generis*, and competent to bind himself, his consent to the irregular investment would be justification of the trustee's action, and a waiver of all claims against him from resulting loss.    Pomeroy's Eq. Jur., Sec. 1074;  Elling v. Marx, 4 Fed. Rep. 673.

If trustees make an improper investment with the knowledge, assent and acquiescence, or at the request of the *cestui que trust*, they can not be held to make good the loss, if one happens.    1 Perry on Trusts, Sec. 467.

In Sherman v. Parish, 53 N. Y. 483 (at 492), Folger J., says :    It is stated, generally, in the text-books, that acquiescence by the *cestui que trust*, in a breach of trust by the trustee, will bar a recovery therefor (Hill on Trustees, *525, *et seq.;* Perry on Trusts, Secs. 467, 849; Lewin on Trusts, 773, 774); and this proposition is sustained by the authorities cited, of which see Brice v. Stokes, 11 Vesey, Jr. 325.

" Though trustees invest in improper securities, or such as the courts are known to avoid when ordering trust investments, yet they will not be held responsible for losses, nor be held for interest, if the interested parties for whom they act have themselves directed the investment.    These parties, when of age and capable of contracting in all respects, estop themselves from complaining when they have investigated the transaction which results to their own detriment.    Had the court acted for them and ordered the investment in the security which proved inadequate, the trustee would not have been more clearly blameless, than when the *cestui que trust* gave the direction."    11 Am. & Eng. Ency. of Law, 841;  Poole v. Munday, 103 Mass. 174; Booth v. Booth, 1 Beav. 125;  Walker v. Symonds, 3 Swanst. 64.

The rule upon the point of a trustee making a profit out of his trust is frequently overstated.    When accurately stated, it is as follows : A trustee shall not take advantage of his situation to obtain a personal benefit to himself at the

expense of his *cestui que trust.* Slow v. Law, 3 Blatch. (U. S.) 459; Jamison v. Glascock, 29 Mo. 191; Parkist v. Alexander, 1 Johns. Ch. 394.

A trustee can not use his position to make a profit out of his *cestui que trusts.* Wychoff v. Wychoff, 44 N. J. Eq. 56.

A person standing in a fiduciary position shall never be permitted to make gain to himself of the trust property in his hands. In this case the administrator converted the trust property to his own use. Gardiner, Admr. of McLuchlain, deceased, 1 Ed. Ch. (N. Y.) 128.

In the great majority of cases found in the books, the trustee has mixed the funds of the estate with his own, or bought in the property of the estate for his own use.

Where sale is made by a public officer adverse to the interests of the *cestui que trust,* and the trustee has not the means in his power to prevent the sale, he may bid in the property for his own use. Chorpenning's Appeal, 32 Pa. St. 315.

A partner may contract with firm if in good faith. Whitman v. Powdan, 27 S. C. Eq. 53.

The rule does not mean that a trustee is absolutely prohibited from making a profit out of his trust relation. It means that he must not make a secret profit out of it. 3 Thompson on Corp., Sec. 4025.

MR. JUSTICE SHEPARD DELIVERED THE OPINION OF THE COURT.

The appellee, Catherine M. White, is the widow, and sole executrix and legatee, of Hugh A. White, deceased, who died in March, 1894.

For a period of about nine years next preceding his death, Hugh A. White was trustee under the will of Francis C. Sherman, deceased, by virtue of appointment, as such, by a decree of the Circuit Court, to take the place of certain former trustees. As such trustee he had charge of what is known as the Sherman House property, in the city of Chicago, and was in receipt of a large income therefrom.

The said will of Francis C. Sherman provided, in terms, that the trustee therein named, and his successor, should .

" hold and manage said Sherman House property   \*   \*   \* during the natural life of my said wife and children, and until the death of the last survivor of them, and until the youngest child of any and all of my said children shall become and be of the age of twenty-one years, and then convey the same to the heirs of my said children, the heirs of each child representing and being entitled to one equal share."

After the death of said White, the appellant James H. Swan was appointed, in like manner, his successor, and by the decree appointing Swan, the appellee was directed to pay over to him all the moneys in her hands belonging to said Sherman trust, and to account with him in reference to the affairs of the trust.

This bill was filed by said Swan as trustee, and all persons now living who are interested in said trust, viz., the two surviving children of said Francis C. Sherman, and their respective children, to enforce the accounting so ordered.

The controversy is confined to certain railroad stocks bought by White with the money of the estate, and certain commissions received by White on insurance premiums paid by him.

One of the provisions of a codicil to said will was as follows:

" I direct that the compensation to be received by any trustee in said will contemplated for the performance of any duty of any kind or description, as such trustee, shall not exceed fifteen hundred dollars per annum."

As to the railroad stocks, it appears that on February 25, 1888, White purchased, with the funds in his hands belonging to said trust, 100 shares of the stock of the Chicago, Rock Island and Pacific Railroad Company for $11,300; and again, on October 27, 1888, he purchased another 100 shares of the same stock, and 100 shares of Missouri Pacific Railroad Company stock, paying therefor funds of the estate to the amount of $18,150, making a total, so used, of $29,450. The certificates for said stock were taken by White in his individual name, and not as trustee.

It appears that White was accustomed to make reports every six months, showing his receipts and disbursements, to the heirs of the estate, who are the appellants with Swan, the trustee; and that two of the heirs were not of age when the stocks were bought, and that one of them did not become of age until in 1892.

Accordingly, in his report of July 1, 1888, which was the report next following the purchase of the first 100 shares of Rock Island stock, it was made to appear that he had bought for the estate some stock in that company, but without specifying how many shares, to the amount of $11,300, and had received a dividend thereon.·

In his report of January 1, 1889, which was the one next following the purchase of the 100 shares in the Missouri Pacific company, and another like number of shares in the Rock Island company, he made no mention of having purchased those stocks, but, presumably, in order to account for the money paid for them, his report stated as follows : "Pd. Winchester & Co., acc't loan; Voucher No. 249, $18,150."

In that same report, under the heading of investments and assets, he stated : " To cash invested in railroad securities, $29,450."

This amount of $29,450 was the aggregate of his stock purchases as already stated, and it is carried along in all subsequent reports down to and including July 1, 1890, under the heading of investments as, " Cash invested in railroad securities."

From that date it is successively called, " Cash invested in R. R. stock," and " invested in stocks," until in the last report of January 1, 1894, it is denominated under the heading of " resources," as " Sundry railroad stocks (cost), $29,450."

Wherever in the reports there occurs a statement of receipts from the railroad companies, it is usually as interest, but is sometimes mentioned as dividends.

In none of the reports is it stated, except inferentially, that any Missouri Pacific stock had ever been bought for the estate, or was held by it, and in but one report, that of

July 1, 1892, was it ever stated how many shares of stock in either company was owned by the estate. In that report it is parenthetically stated that the estate has 200 shares of Rock Island stock. And in no report, nor in any other manner, until after Mr. White's death, was it made known to the heirs that all or any of the stocks stood in his individual name.

These matters are here mentioned because of their possible significance in connection with the question to be considered later on with reference to the knowledge and acquiescence, by the appellant Sherman heirs, in those investments, as claimed by the appellee.

The moneys so used by the trustees were derived from the rents of the particular Sherman House property which was the subject or body of the trust. That property was incumbered by mortgage, which would mature in July, 1892, to the extent of $450,000, at the time these surplus funds were so used, and it was probably the duty of the trustee, under the will, to accumulate and temporarily invest the surplus rents until such times as they could be applied in liquidation of such incumbrance.

Such seems to have been the reasonable intention of the testator, Francis C. Sherman, for, by his will, he directed the trustee to pay from such rents only certain limited sums to his wife and children respectively, and to apply the remainder to the payment of said indebtedness until the same should be fully paid.

In the nature of an ordinary mortgage indebtedness, payments by way of application thereon are not permissible whenever it may suit the convenience of the mortgagor, and it would, therefore, be but to apply a reasonable and common rule to the trustee to require him to use reasonable diligence to employ at interest such considerable sums as may come to his hands during the period that they must await opportunity for application upon the indebtedness which their accumulation is intended to discharge.

Whether, after such surplus rents were accumulated, they constituted an augmentation or increment to the body of the

trust estate, viz., the Sherman House property, or were properly mere income, and not principal, we do not care to follow the arguments of counsel concerning, for we regard the duty of the trustee toward the same as unaffected thereby. His trust duties toward the same, under the terms of the will, were to collect, hold and apply the same as directed. His power to control the surplus rents, pending their actual appropriation in payment of the mortgage indebtedness, was as absolute if called income as if called increment, and no confusion of names could relieve him of his responsibility with reference to them. Until the mortgage indebtedness was paid, neither the children nor grandchildren of the testator, who may comprise the ultimate beneficiaries under the trust, were permitted by the will to have any voice in the management of the trust estate. See Blatchford v. Newberry, 99 Ill. 11. The trustee alone was vested with its absolute control. After the mortgage indebtedness should be paid off, the entire income of the trust property was to be applied to the designated beneficiaries, until the arrival of the time when the property itself should be conveyed to them; but so long as that indebtedness remained, the right of the beneficiaries to the income was limited to the particular sums directed to be paid to them from such income, and they were without power to direct the application of the income in any other regard.

The trustee having been, therefore, in full control of the surplus income, was the use he made of the $29,450 in question, in the manner indicated, such an employment thereof as relieves him of personal liability ?

It is not necessary to ascribe to Mr. White, the trustee, any unworthy intention with reference to the purchase of either of said stocks. The question is mainly one of law, upon a state of facts about which there is not much disagreement.

It is not necessary to formulate a rule within which equity will require a trustee to keep, with reference to the character of security in which he may make temporary investments of unemployed trust funds; but it may with safety

be said that investments in speculative railway stocks are most clearly not within the limit of any correct rules upon the subject. An ordinary prudent business man may, and perhaps often does, take his chances in such investments, with the hope of attaining extraordinary gain, along with the risk of considerable or total loss, but it is certain that trustees can not be permitted to so risk their trust funds. Pomeroy's Eq. Juris., Sec. 1074; Hill on Trustees, 377, 378, 380, 381.

It was proved, and the master found, from the evidence, that Chicago, Rock Island and Pacific Railroad stock was very fluctuating, and that Missouri Pacific was still more fluctuating in value. The witness, through whom Mr. White bought the last 200 shares of Rock Island and Missouri Pacific, described them both as being more or less "wild cat," in the language of the market, and testified that the range of quotations on the market, in Rock Island, from January to December, in the year 1888, in which these purchases were made, was from $114\frac{1}{2}$ down to $95\frac{7}{8}$, and that when the price was high, a fluctuation of from $20 to $30 a share was a fair year's range. During the same year of 1888, Missouri Pacific quotations fluctuated between $89\frac{3}{4}$ and $66\frac{1}{4}$.

If lack of knowledge, by Mr. White, of the character of the stocks in question, would in any way affect his liability on account of the investments, it would seem that it could not be urged in his favor. It was shown in the case that commencing in the latter part of 1887, he dealt on his individual account quite extensively, about $2,000,000 worth, in railroad stocks on margins, and otherwise, and the presumption from the evidence is, that he knew the stocks in question were of a speculative and fluctuating kind. Ihmsen's Appeal, 43 Pa. St. 431.

But it is said that the appellants, who are the only living beneficiaries, acquiesced in these investments.

The only evidence of their acquiescence is to be found in the half-yearly reports made by Mr. White, and in the testimony of Miss Alice Lenaghen, who was a stenographer in Mr. White's office from 1886 up to the time of

his death. The testimony of Miss Lenaghen was in effect that in January, 1887, some of the heirs were present in Mr. White's office talking about the affairs of the estate and that he then explained to them the difficulty of loaning the surplus funds, and that he saw no way except to invest them in stocks, or call loans, or else let them lie idle; and that one of the heirs present told him to use his own judgment in the matter. That conversation was more than a year before the first 100 shares of Rock Island stock were bought. She also testified to hearing several subsequent conversations between Mr. White and some of the heirs concerning the investment of the surplus, at which he was told, as before, to use his own judgment, and that they were satisfied, but that the only time anything was said about investing in stocks, was in January, 1887.

It is manifest that there was no acquiescence in January, 1887, in an act that was not done for more than a year afterward, and which was only spoken of in most general terms as being in contemplation.

To bind one, as by acquiescence, it is necessary that there should be a free disclosure of every circumstance material to be known. Hill on Trustees, 382.

A man can not be said to acquiesce in what he does not know, nor can he be bound by acquiescence unless he is fully apprised of his rights. Kerr on Fraud, 297 to 303.

The furnishing of the half-yearly reports to the heirs by Mr. White, if they had been certain and definite, and such as persons of ordinary business capacity could have fully understood, or if there was any proof that they were ever explained to the heirs by Mr. White, would furnish much better ground for sustaining the theory of acquiescence than is to be found in Miss Lenaghan's testimony.

What we have before said with reference to the indefiniteness of those reports, as to what particular stocks, and the quantity of them, and whether they were purchases, or securities for loans, need not be repeated.

That the reports were misleading must be apparent to any one who, without other information, should examine them.

With reference to the $18,150 now known to have been invested in Missouri Pacific, and the second lot of Rock Island shares, the certificates for which were taken in White's individual name, there seems never to have been any full disclosure thereof made by White. The report which accounted for the money they cost showed on its face a loan of that sum. It would seem to be hardly susceptible of any other reading by a person of ordinary understanding, and that it would be so interpreted by an expert book-keeper is shown by the testimony of the expert who examined the reports in connection with Mr. White's books of account, and testified that the report showed a loan instead of a purchase, and that White's books showed the same—although it was otherwise conclusively proved that no such loan was ever made.

We are unable to comprehend how the furnishing of such information can be regarded as coming within the rule that demands full information of all that is material to be given to one against whom estoppel by confirmation and acquiescence is invoked.

Omitting, therefore, all reference to the question whether the now living Sherman heirs, the co-appellants with Swan, the successor of White in the trust, could, by acquiescence on their part, bind Swan as the representative of the ultimate beneficiaries, of whom the present living heirs may or may not be all, or any, but assuming that their acquiescence would bind Swan, we think no sufficient acquiescence by them has been shown; and the burden of showing such acquiescence was upon the appellee.

The proof of knowledge of the facts relied upon must be made by the party who alleges acquiescence and sets it up as a defense. Kerr on Fraud, 301.

Furthermore, it has been seen that White, as trustee, was vested with full dominion and control over the trust funds.

The Circuit Court, however, found that there was such acquiescence, and decreed that the appellee should deliver said certificates of stock, and that appellant Swan, the new trustee, should receive and accept the same, together with

such dividends as appellee may have received from them, in full acquittance and satisfaction of all claims and demands of the Sherman estate against said White, as trustee, growing out of the said investments.

As has been seen, we do not concur with the correctness of the decree in that regard.

Coming now to the commissions received by White on premiums paid by him for fire insurance on the Sherman House, it was a part of White's duty under the terms of the trust to keep the building insured, and it seems that after he was appointed trustee and some time about December, 1887, he made inquiry of insurance agents as to how he might obtain a commission on insurance to be placed by him, and was informed that in order to be able to do so he must join what was known as Class 3 of the Underwriters' Association, and he did so. By becoming a member of that association, which included most, if not all, the fire insurance companies in good standing that did business in Chicago, he became entitled, under the rules of the association, to a commission of seven and one-half per cent of the premiums on all insurance placed by him in any of the companies forming the association. During the period of his membership in said association, covering a period of about six years, he was paid, for such commissions, the total sum of $3,196.04 in the matter of insurance effected by him on said trust property, no part of which was ever accounted for by him. His annual membership dues in said association, during the six years in which he was paid commissions, were $100, or a total of $600. By the terms of the decree White's estate was charged with the commissions received by him, less said membership dues.

Cross-errors for so charging White are assigned by appellee.

The by-laws of the Underwriters' Association provided that if any member should allow his customers the benefit of any part of the commissions paid to him he was liable to a fine of $100 for each offense; and in default of the payment of such fines was liable to expulsion.

And there is no evidence to show that if White had not joined said association and received said commissions he could have obtained good insurance at any less rate, or that the estate was actually injured by the fact that White received the commissions.

The argument of the appellee is that because the personal profit gained by White in this insurance matter was not acquired at the expense of the estate, he should not be charged with it.

It may not be denied that a trustee may sometimes, under peculiar circumstances, and in an open manner, be entitled to make a personal gain to himself out of the trust property, when not done at the expense of the trust.

But the occasions under which the trustee in such dealings will be protected are rare and exceptional, and we do not think this case comes within any authoritative exception to the general rule that he will not be protected. The taking of these commissions was secretly done. No report of them was ever made by White, and they do not appear on any books of account kept by him with the trust property. They were not learned of by any one interested in the estate, from December, 1887, when they were first paid to him, until after his death in March, 1894, and the receipt of them by White was denied by appellee in her answer to this bill.

By the provision of the will, heretofore quoted, creating this trust, the compensation of the trustee was expressly limited to fifteen hundred dollars a year. With full knowledge of that White accepted the trusteeship, and he should not be allowed to make any more than that out of the trust. The question is not altogether whether the trust estate actually lost anything by what he gained. The court ought not to look exclusively to the single transaction complained of, but should inquire into the tendency of the transaction. Considering the frailty of human nature, we may well regard the temptation to take excessive insurance in order to add to the commissions. The discretion of a trustee, in the matter of determining upon the amount of insurance

upon a large property, ought to be freed absolutely from every element. which might possibly have a tendency to induce him to take into account his individual gain.

Another argument is based upon the fact that the commissions were paid to White, and could only have been obtained by him as a member of the Underwriters' Association, and that White would have been subject to fine and expulsion if he had accounted for them in his trusteeship.

A dual capacity, as an excuse for misusing a position of trust, has not, as far as we know, any well-founded standing in equity jurisprudence.

The bar is familiar with the long established rule in this State that one who is an executor or administrator, though he be an attorney at law, is not permitted to have attorney's fees for legal services rendered by him to the estate. A plenty of other analogous illustrations will occur to the mind of every lawyer.

The reason for such rules is that duty and interest must not be allowed an opportunity to come into conflict.

The Sherman House property includes the hotel proper, and a large number of stores, rented to several tenants.

Supposing that in the course of leasing the hotel, or the stores, the intervention of a real estate or renting agency were desirable; would it be contended that the trustee might resolve himself into such an agency, or engage in such an agency as an adjunct to his other business, and charge a real estate broker's commission on all leases made by him? To do so would be a plain violation of the terms of the trust, which makes it part of the trustee's duty to lease the property and otherwise manage it for a stipulated compensation of fifteen hundred dollars a year; but it would not be a much plainer violation of the terms of the trust, than for the trustee to join an insurance association in order to obtain commissions for placing insurance on the trust property, which, under the trust, he was required to do.

The appellants complain that the Circuit Court, although decreeing that appellee should account for these insurance commissions, deducted from their amount the six hundred

dollars paid by White for membership dues in the Underwriters' Association during the period that the commissions were paid to him.

This contention is principally based on the proved fact that Mr. White placed insurance on other property than the Sherman House during the period of his membership in the association, and that, presumptively, he was paid a commission therefor, and hence that the Sherman estate should not stand the whole cost of the membership.

The premiums proved to have been paid by Mr. White on all property not belonging to the Sherman estate aggregated only $104, and the commissions thereon are too trifling to be noticed in this connection, even if it had been proved that they were paid to White, which was not done.

It is also urged that he, having joined the association to get commissions for himself, and having appropriated them to himself in violation of his duty, the penalty of requiring him to pay to the trust estate all the profits he made, without deducting the cost of membership, should be imposed. But we think not. It is not the province of equity to punish, but only to require that which is right to be done.

So much of the decree of the Circuit Court ordering the appellee to pay over to the appellant Swan, in due course of administration, the sum of $2,841.54 (unless that sum is $100 too much: 2,596.04, plus $145.50, equals $2,741.54), with five per cent interest from April 27, 1894, is affirmed; but the decree is in all other respects reversed, and the cause remanded, with directions to the Circuit Court to enter a decree charging the appellee with the further amount of moneys belonging to said estate invested by said Hugh A. White in the said 200 shares of Chicago, Rock Island and Pacific Railway Company stock, and the said 100 shares of Missouri Pacific Railroad stock, aggregating $29,450, making proper deductions for dividends received thereon; interest, with annual rests, to be allowed on the sums so invested from the dates of investment, at the rate of six per centum per annum, until July 1, 1891, and thereafter at the rate of five per centum per annum, less deductions

for all dividends received, with like interest; and to order the payment by the appellee to the appellant Swan, in due course of administration, of the sum so ascertained, in addition to said sum of $2,841.54, and interest. Affirmed in part, and reversed in part, with directions.