OF

# THE STATE OF NEW JERSEY.

## OCTOBER TERM, 1911.

MAHLON PITNEY, ORDINARY.

EDWIN ROBERT WALKER, VICE-ORDINARY.

In the matter of the estate of THOMAS C. HILL, deceased.

EDMUND C. HILL and CHARLES W. HOWELL, trustees, &c., appellants,

*v.*

THOMAS C. HILL and RAYMOND D. HILL, respondents.

[Decided January 12th, 1912.]

1. A trustee is not permitted to make a profit out of the administration of the trust.

521

2. An equitable estoppel extends only so far as to protect from loss the party entitled to assert it; he may claim indemnification only.

3. A trustee's accounting, whether in the orphans court or in the court of chancery, is to be dealt with on equitable principles.

4. A trustee being in possession of land belonging to the trust estate under a lease made by himself and his co-trustees, and good against the *cestuis que trustent* only because made in the ordinary course of business and for a full rental, pursuant to a course of practice to which they had impliedly assented, found a purchaser for the property at a price materially above the fair market value, and thereupon consented to the sale, including a surrender of his leasehold.—*Held*, that the trustee was entitled only to compensation for what he lost by the surrender, to be computed according to the *quantum valebat*, and must concede the whole of the special profit to the estate of which he was trustee.

5. The jurisdiction of the orphans court over the subjects committed by statute to its cognizance is a general jurisdiction, similar to that of the chancery and prerogative courts. Its authority over the accounts of trustees under wills is as ample as that of the court of chancery.

6. Each of two or more joint trustees must exercise reasonable diligence with respect to his approbation of and acquiescence in the acts of his co-trustees.

On appeal from a decree of the Mercer county orphans court.

*Mr. Alan H. Strong,* for the appellants.

*Messrs. Vroom, Dickinson & Scammell,* for the respondents.

PITNEY, ORDINARY.

In an accounting before the orphans court by Edmund C. Hill and Charles W. Howell, trustees under the will of Thomas C. Hill, deceased, they charged themselves with the sum of $53,625, received from S. P. Dunham & Company as proceeds of the sale of a parcel of real estate known as No. 11 North Broad street, in the city of Trenton (the nominal price being $55,000, with a discount of two and one-half per cent. for cash payment), and they prayed allowance for $1,375 paid to Messrs. Case & Cain, real estate agents, for commissions on this sale.

To this account three exceptions were filed by Thomas C. Hill and Raymond D. Hill, sons of the testator and beneficiaries under the will. The first alleged that the accountants received a much larger sum from Dunham as the purchase price of the property

mentioned, the precise amount being unknown to the exceptants, and prayed that the accountants should be charged with this excess. The second exception challenged the allowance to the accountants of the commissions paid to Case & Cain. The third sought to charge the accountants with the sum of $600 per year for a period of years prior to the sale of the property to Dunham, being the difference between the rent of $200 per year for part of the premises leased by the trustees to one of their number, Edmund C. Hill, and the rent of $800 per year alleged to have been obtained by him from S. P. Dunham & Company, under a sublease during the same period.

The orphans court, after a full hearing, sustained the first exception to the extent of surcharging the trustees with the amount of $12,000, sustained the second exception by disallowing the item of $1,375, commissions paid to Case & Cain, and surcharged the trustees to the extent of $2,700, by reason of the matters set up in the third exception.

From the whole of the decree thereupon made the accountants have appealed to this court.

The respondents, in their answer to the petition of appeal, have alleged by way of cross-appeal (as permitted by rule 2 of this court) that the decree is erroneous, in that it should have surcharged the trustees with $20,000 (instead of $12,000) for purchase-money received from Dunham over and above the amount acknowledged by them in their account.

The evidence taken before the orphans court upon the hearing of the exceptions is quite voluminous. It is very fully reviewed in the learned and able opinion delivered by Judge Rellstab in that court, of which, for convenient reference, a copy is hereto appended.

The testator, Thomas C. Hill, died some years before the transactions that are in question, seized of the lot of land No. 11 North Broad street, in which he had carried on a bakery and restaurant business in partnership with his son Edmund C. Hill. By his will he gave this property in trust to his executors, Edmund C. Hill and Charles W. Howell, authorizing them to sell it, with a proviso that it should not be sold during his wife's lifetime for less than $45,000. After the testator's death, Edmund C. Hill

continued the business, at first carrying it on in his own name, and afterwards in the name of a corporation known as the Thomas C. Hill & Son Company.

As will appear below, E. C. Hill was sole proprietor and manager of this company—he and it were identical.

Leases of the property were made from time to time by the trustees of the estate to the Thomas C. Hill & Son Company; but until April 1st, 1900, these leases did not include the rear of the lot. Adjoining properties were occupied by the large mercantile firm of S. P. Dunham & Company, and this firm leased the rear of the Hill property from the trustees for a number of years and down to April 1st, 1900. From that time until July 1st, 1905, the entire premises No. 11 North Broad street were under lease from the trustees to the Thomas C. Hill & Son Company (at an advance of $200 in the rent), but Dunham & Company were permitted to remain in possession of the rear portion. During the last nine months of the year 1900 they paid no rent so far as appears. From and after January 1st, 1901, the Hill company leased the rear to Dunham & Company, at a rental of $800 per annum. The orphans court charged the trustees with this difference of $600 per annum from January 1st, 1901, until July 1st, 1905, a period of four and one-half years, making a total of $2,700.

It is objected by counsel for appellants that this surcharge goes beyond the claim of the exceptants, which, as set forth in the exception, was that the accountants should be charged with $600 per year, on this account, only from January 1st, 1903, to April 13th, 1905, viz., $1,421.67. The exception was framed without full information as to the facts, and since the merits were fully tried, and the evidence justifies the conclusion reached by Judge Rellstab upon the facts, I will allow an amendment of the exception to make it conform to the facts as found.

It is contended by counsel for the respondents that the trustees were without power to make a lease of the trust property to one of themselves, and that for this reason the lease to the Thomas C. Hill & Son Company was invalid. I agree that, except so far as the respondents are estopped to make objection by reason of the circumstances presently to be mentioned, the lease referred to

would on general principles be at least voidable at the instance of the *cestuis que trustent*. *28 Am. & Eng. Encycl. L. (2d ed.) 1016; 1 Perry Trusts § 209; Attorney-General* v. *Clarendon, 17 Ves. 491, 500.*

But, as already pointed out, leases of the premises (not including the rear portion) had been made by the trustees from time to time ever since the death of the testator, being made at first to E. C. Hill in his own name, and afterwards to his corporation. And, as shown in the opinion of Judge Rellstab, these leases were, under the circumstances, calculated to produce a greater income for the estate than if the same premises had been rented for other purposes and to other tenants. So far, therefore, as they included the premises used by E. C. Hill in his business as baker, restaurateur and confectioner, and reserved a full rental, the leases promoted the general interests of the trust. These facts, taken in connection with the fact that the leases were known to the *cestuis que trustent* who are now excepting, and had been impliedly approved by them, have the effect, I think, of estopping the exceptants to question the propriety of the general policy of leasing the bakery premises to E. C. Hill's company for successive terms of years, so long as the rentals were equivalent to the full value of the premises demised.

But the estoppel, I think, goes no further than the course of business, thus known and assented to by the *cestuis que trustent*, may be reasonably deemed to extend it.

The evidence shows that the act of the trustees in refusing to renew the lease of the rear of the premises to Dunham in the spring of 1900, and in leasing that part to Hill's company, was inconsistent with the previous course of business, was not necessary for the purposes of Hill's business, and not assented to by the exceptants. For this reason, if for no other, the inclusion of the rear of the premises in the lease to the Hill company is not covered by the estoppel.

But aside from this, and supposing the respondents to be estopped, by their previous acquiescence in the practice of leasing to Hill's company, from objecting to the present lease *as a lease,* it does not seem to me that they are thereby debarred from claiming for the estate the extraordinary profit derived by E. C. Hill

through subletting the rear of the property to the Dunham firm. The implied assent, from which the estoppel arises, did not extend to any profits made by the trustee except such as might be expected to arise in the ordinary course of business.

It is only on the theory that the lease reserved a full rental that the *cestuis que trustent*, because of their knowledge and implied approval of prevous leases, are estopped to object. The estoppel goes no further. And there is nothing in the circumstances to sanction so extraordinary a profit as $600 per annum upon a sublease of property let by the trustees to one of themselves at $200 per annum. The law is most strict in denying to trustees any profit to be derived through any kind of traffic in the property of the trust estate. In addition to the references above given, I may cite a few decisions, out of many that might be cited, to show how resolutely the court of last resort in this state has enforced the rule under any and all circumstances. *Staats* v. *Bergen, 17 N. J. Eq. (2 C. E. Gr.) 554, 558, 559; Marshall* v. *Carson, 38 N. J. Eq. (11 Stew.) 250, 253; Bohle* v. *Hasselbroch, 64 N. J. Eq. (19 Dick.) 334, 336; Marr* v. *Marr, 73 N. J. Eq. (3 Buch.) 643, 648.*

It is a fundamental part of the doctrine of equitable estoppels that the estoppel extends only so far as may be necessary to protect from loss the party entitled to assert it. He may claim indemnification, but not profit. *Den* v. *Baldwin, 21 N. J. Law (1 Zab.) 395, 403, 405; Phillipsburg Bank* v. *Fulmer, 31 N. J. Law (2 Vr.) 52, 55; Campbell* v. *Nichols & Co., 33 N. J. Law (4 Vr.) 81, 88; Cowley* v. *Smyth, 46 N. J. Law (17 Vr.) 380, 383; Central Railroad Co.* v. *McCartney, 68 N. J. Law (39 Vr.) 165, 175, 176; Ruckelschaus* v. *Oehme, 48 N. J. Eq. (3 Dick.) 436, 442; Robeson* v. *Robeson, 50 N. J. Eq. (5 Dick.) 465; Dixon* v. *Bentley, 68 N. J. Eq. (2 Robb.) 108, 123; Baker* v. *Wood, 157 U. S. 212, 219; 16 Cyc. 783.*

And this strict limitation to indemnification ought, I think, to be most rigidly insisted upon where the estoppel is asserted by a trustee in contravention of his duty to refrain from making a profit out of the administration of the trust estate.

Assuming, therefore, that when trustee Hill, in the spring of the year 1900, caused the rear portion of the premises in question

to be leased to his company, instead of to the Dunham firm, he
expected to use it in his business and was justified in having it
included in his lease, yet when he afterwards found that he would
not require it, and that instead of a rent of $200 per annum which
he had caused his company to agree to pay for that portion of the
property, it could be rented to the Dunham firm at $800 per an-
num, his duty to the estate required that he should cause the Hill
company to surrender the rear portion to the estate to the end
that it might be leased to Dunham; or (what amounts to the
same thing) required that he should account to the estate for the
profit that accrued out of the sublease to Dunham. And so I
concur in the result reached by the orphans court upon this
point.

The next question relates to the sale of No. 11 North Broad
street to the Dunham firm in the year 1905. At this time that
firm was in possession of the rear portion of the premises under
the sublease just referred to, the Hill company being lessee from
the estate of the entire property under a lease that had still about
three years to run. On or about January 1st, 1905, Messrs. Dun-
ham & Company made overtures (through Messrs. Case & Cain,
real estate brokers, employed by them for the purpose) to Edmund
C. Hill for the purchase of the premises. Mr. Hill thereupon
called on his co-trustee, Mr. Howell, and asked him to make in-
quiries respecting the market value of the property. Mr. Howell
accordingly gathered the opinions of three or four persons, as the
result of which he expressed himself to Mr. Hill as willing to sell
the property for $55,000, the highest price mentioned by any of
his informants. The evidence renders it clear to my mind that
Mr. Hill had reason to believe, and did believe, that Dunham &
Company would give much more than $55,000 for the property
and more than what would be considered its ordinary market
value. It does not appear that he discussed this with Howell,
although both knew that Dunham was the would-be purchaser.
Mr. Hill at once resumed the negotiations with Case & Cain, by
whom he was referred to Mr. Dunham, and from Dunham he se-
cured an offer of $75,000, which, as apportioned by Mr. Hill, was
$55,000 for the reversion and $20,000 for his own interest. At
the same time he received a check for $500 to bind the bargain.

Thereupon he endeavored to get his brothers (who were his
*cestuis que trustent*) to consent to a sale of the interest of the
estate at $55,000. Two of them, Harry and Lyman, joined with
him (Edmund) in signing a paper under date January 12th,
1905, addressed to the trustees, approving a sale at the price men-
tioned. (The effect of this upon the rights of the signers will be
considered later.) Mr. Hill called a conference of all his brothers
for the 13th, and tried to persuade Thomas and Raymond (the
present respondents) to sign the paper likewise. They refused to
sign it, chiefly on the ground that Edmund was selling his lease-
hold to the Dunham firm at the same time, and was not willing to
let the brothers know what price was to be received in addition
to the $55,000. At one of these interviews, when one of the
brothers proposed as a compromise that they should authorize the
sale of the property at $65,000, and Edmund to "keep his secret
with regard to the extra money," Edmund objected, saying to one
of the brothers in the hearing of the others: "Harry, if this
does not go through as I have arranged, it shall not go through at
all," and with that the meeting broke up. Messrs. Thomas C.
Hill and Raymond D. Hill testify to this incident, and it is not
denied; Mr. Edmund C. Hill merely saying that he does not re-
member it. From their testimony, and from all the circum-
stances, I am constrained to the belief that Mr. Edmund C. Hill
at that interview placed himself avowedly in the position that his
counsel have since endeavored to maintain for him, namely, that
so long as the estate realized for its reversionary interest an
amount equivalent to the general market value of the property, he,
Edmund C. Hill, was entitled to sell his leasehold (for in the
negotiations it was treated as being—what it was in fact—his
own property, although held in the name of the corporation
Thomas C. Hill & Son Company) for whatever he could induce
Messrs. Dunham & Company to pay for it.

Notwithstanding the failure to procure the assent of the *cestuis
que trustent,* the trustees entered into agreement with Messrs.
S. P. Dunham & Company for a sale of the property (including
the leasehold and the reversion) at $75,000. But in form there
were two agreements (both dated January 14th, and simulta-
neously delivered about a week later), each agreement being ex-

pressly made dependent upon the other.   One was between the
Thomas C. Hill & Son Company ("per E. C. Hill, president")
and Dunham & Company, reciting the companion agreement for
a sale of the property and agreeing

"that when said deed is delivered the said Thomas C. Hill & Son Co.,
who are now in possession of property, for and in consideration of the
sum of $20,000, will deliver possession of and release all claim that said
corporation have or may have in said property to said Sering P. Dunham
& Co.  It being fully understood and agreed that this agreement is part
of and dependent upon the sale of said property, and if said sale is not
consummated, then this agreement to be void and of no effect."

It was further agreed therein that the Hill company would re-
move from the premises all machinery and fixtures used by them
in their baking business, excepting the rear brick oven, which
was to remain the property of Dunham & Company.   The agree-
ment further provided for a discount of two and one-half per
cent. for cash.   The other agreement was made between Hill and
Howell, as trustees of the Hill estate, and the Dunham firm,
agreeing to sell the property for $55,000, payable $500 in cash
on the signing of the agreement, $20,000 by the assumption of a
mortgage upon the property, and $34,500 upon the delivery of
the deed, but with a discount of two and one-half per cent. upon
the $55,000 for payment in cash.   It contains this clause:  "It is
hereby agreed that the vacation and release of said property by
the Thomas C. Hill & Son Company is made a part of this agree-
ment."   Other clauses provide for the delivery of the deed on
July 1st, 1905, and that the purchasers might enter upon the
property on that date.

It seems to me plainly erroneous to treat this as being in any
substantial sense two transactions—as if the Hill trustees were
selling the reversion for $55,000, less two and one-half per cent.
for cash, and as if the Thomas C. Hill & Son Company were
separately selling the leasehold (with or without good will or
fixtures of the business) for $20,000, less two and one-half per
cent. for cash.   Mr. Edmund C. Hill testified something to the
effect that the money paid by Dunham & Company over and above
the $55,000 represented in part the value of the fixtures or good
will of Thomas C. Hill & Son Company, and not merely its lease-

hold. But the weight of the evidence, including Mr. Dunham's testimony and the written documents, is convincing to the contrary, and shows that the Hill company agreed to transfer, and did transfer, nothing beyond its leasehold, retaining the right to remove, and eventually removing from the premises, the trade fixtures, including even the brick oven which, by the terms of the agreement, was to remain the property of Dunham & Company.

As between the Hill estate and the purchasers, the negotiation was conducted (after the first overtures) between Mr. Edmund C. Hill and Mr. S. P. Dunham, and it is plain that so far as the purchasers were concerned, it contemplated but a single transaction, the purchase of the entire property, with the right to immediate possession upon the delivery of the deed. Mr. Dunham's testimony is clear and emphatic that the price was given to him in gross, that there was but one price paid, $75,000, and that he did not know at the time that there were to be two articles of agreement drawn up.

The evidence does not, I think, justify the inference drawn by Judge Rellstab, that upon the consummation of the agreement, the purchaser, besides paying to the trustees $53,625, *paid to the Hill company* $19,500 for the possession and its rights under the lease.

As I read the evidence, the amount paid in excess of $53,625 *went to Edmund C. Hill individually, and does not appear to have been turned over by him to the Hill company or to anybody else.* It is not pretended that the $500 paid by Case in January was actually turned over to the T. C. Hill company at any time. Manifestly, it could not be turned over to that company prior to the closing of title (even on Mr. E. C. Hill's own theory as to his rights) without the plainest breach of his duty to the estate; for on his own showing it *bound the bargain for the estate,* and it is mentioned in the estate's agreement with the Dunham firm as *paid on account of that agreement.* Yet the $500 is not entered upon the trustees' account as having been placed to the credit of the estate at any time. The only item with which the trustees charge themselves on account of the sale is $53,625 received from S. P. Dunham on June 29th, 1905. This date no doubt refers to

the time of the delivery of the deed. As to this transaction, Mr. Dunham testifies that there were three checks, one to the Trenton Savings Fund for $20,197, to pay off a mortgage upon the property, one drawn to the Hill estate for $33,427.72, *and one drawn to Edmund C. Hill for $18,975.36.* "At the time the purchase was made we paid $500 down to bind the bargain." And Mr. E. C. Hill, being shortly afterwards called to the witness stand, had his attention called by his own counsel to this topic, and was asked:

"*Q.* At the time of the settlement, in what manner was the payment made, or payments?

"*A.* The two agreements were concluded separately, and there were checks drawn to cover two agreements separately.

"*Q.* You heard the testimony of Mr. Dunham as to that; is that substantially correct?

"*A.* Yes, sir."

What Mr. Hill did with the $500 paid to him in January by Mr. Case, and with the $18,975.36 paid to him on or about July 1st by Mr. Dunham, does not appear by direct evidence, excepting that E. C. Hill testified at a later stage of the hearing that he paid to one Lynch, a photographer, who at the time of the sale was in possession of two rooms as a subtenant, the sum of $200 to vacate the premises. Mr. Hill was asked particularly:

"*Q.* Did that come out of the company's money?

"*A.* No, I paid it personally.

"*Q.* You paid him to vacate the premises?

"*A.* Yes, sir, to vacate the premises."

It will be observed that while the agreement between the Hill company and Dunham & Company called for a payment of $20,-000, less two and one-half per cent. for cash, or $19,500 net, the check turned over by Mr. Dunham to Edmund C. Hill was for $18,975.36. Adding to this the $500 paid by Case to Hill in January, we have $19,475.36. The difference of $24.64 necessary to make up the sum of $19,500, is not accounted for. No point has been made of this in argument, and it would be improper to base a reversal upon it, since it was in effect conceded throughout the hearing below that Mr. E. C. Hill, or his company, received the entire consideration of $19,500.

It is contended by counsel for the appellants that this $19,500 was received, if not by the Thomas C. Hill & Son Company, then by Edmund C. Hill "in the name and for the use" of that company. The evidence shows that it was received by Edmund C. Hill personally, and not in the name of the company. To say that he received it for the use of the company begs the question. He did not so receive it unless the money was justly and honestly due to the company. If it came to Mr. Hill's hands through a breach of his duty to the estate of which he was a trustee, then to the extent that it rightfully belonged to the estate it was received by him to the use of the estate and not to the use of the company.

But to my mind it would make no difference, for the purposes of this accounting, if it did appear that the money in question was turned over by Hill to his company. Nor, in my opinion, is it of material consequence whether the excess rent, referred to in the third exception, was paid by Dunham & Company to the Hill company or was paid to Mr. Hill individually. For the evidence shows that in truth Edmund C. Hill and the Thomas C. Hill & Son Company were one and the same. Mr. Hill was admittedly the owner of all the capital stock, except qualifying shares standing in the name of his wife and one or more of his employes. These qualifying shares, he says, were only two, or, perhaps, ten in number, out of a total issue of six hundred shares; and it seems to me the only reasonable inference to be drawn from all the circumstances disclosed in the evidence is that in fact E. C. Hill was the equitable owner of the qualifying shares also, the holders thereof being his "dummies." The evidence throughout shows that whatever corporate existence the company may have at law, Mr. Hill was its sole proprietor, as well as manager, and the corporation constituted simply the guise under which he carried on his business.

The accounting of a trustee respecting the administration of his trust of course must proceed according to the truth of the matter, and he will not be permitted to shield himself behind so transparent a cloak. Whether he accounts in the orphans court or in the court of chancery the account is to be dealt with on

equitable principles. *Woolsey* v. *Woolsey,* 68 *N. J. Eq.* (*2 Robb.*) 763; *Woolsey* v. *Woolsey,* 72 *N. J. Eq.* (*2 Buch.*) 898, 900.

The case, therefore, resolves itself into this: a trustee being in possession of land belonging to the trust estate, under a lease made by himself and his co-trustee, a lease good as against the *cestius que trustent* only because made in the ordinary course of business and for a full rental, pursuant to a course of practice to which they had impliedly assented—this trustee finds a purchaser for the property at a price materially above what he asserts to be the fair market value of the property. He assumes to concede to his estate, for the "reversion," a sum equivalent to the alleged market value, and retains for himself the excess as compensation for the surrender of his leasehold.

It seems to me the well-established rule already adverted to— that a trustee will not be permitted to profit out of his administration of the estate—forbids this.

The *cestuis que trustent,* in assenting to the practice of leasing to E. C. Hill, estopped themselves from objecting to any ordinary profit he might have made *as tenant* over and above a full rent paid to the estate. But the estoppel is, on grounds already mentioned, strictly limited to this.

The burden of appellants' argument upon this point is that trustee Hill, being in possession under the lease, could not be "compelled" to give up any of his rights in favor of the estate; was "not required to sacrifice for the benefit of the estate a property right already possessed by him;" that he "might refuse to give up the leasehold at any price," &c. This argument, however, does not meet the case before us.

For present purposes we may assume, without conceding, that although he knew of Dunham's desire to purchase the property upon terms of immediate possession, and knew that the estate might reap a great advantage if he as lessee would consent to surrender the lease, Mr. Hill was still under no legal obligation to consent to its surrender prior to the expiration of his term.

Nevertheless, the fact remains that he did consent, and made such surrender one of the terms and conditions of the sale of the property to Dunham. He thereby commingled his own

interests with the interests of the estate, and bargained them off to an outside party in one and a single transaction. Having done so, he cannot afterwards stand upon what might otherwise have been his legal rights under the lease.

His attitude at the time was, and still is, that since the sale was made to Dunham at what may be called a "fancy" price, the special profit thereon should inure to him, or what is the same thing, to his company. He proposes to concede $55,000 to the estate upon the principle of the *quantum valebat,* retaining the whole of the special profit to himself. In my judgment this position is wholly untenable. Since he consented to throw the leasehold into "hotch potch" with the reversion for the purposes of the sale (a sale made *in solido* for $75,000, for that was the essence of the transaction), I think he must now accept compensation for what he has lost on the principle of the *quantum valebat,* and must concede the whole of the special profit to the estate of which he is trustee.

It does not lie in his mouth to say that he consented to a surrender of the lease only on terms of getting $19,500 for it. As already pointed out, a trustee's accounting depends upon equitable principles, and it is not equitable for him to take the position that except for the prospect of an illicit bonus to accrue to himself he would not have consented to that which was otherwise beneficial to the estate. Such an attitude would be an attempt to take advantage of his own wrong.

Counsel for the appellant cites *Marr* v. *Marr, 73 N. J. Eq.* *(3 Buch.) 643,* where the court of errors and appeals, in the case of a director of a corporation who was also its creditor, and who obtained judgment against the company, and on execution sale bought in its property for a consideration not exceeding one-half of its value, held that the director took title subject to an option on the part of the *cestui que trust* to have the benefit of the purchase. In the opinion, which was prepared by me, occurs the following language (*3 Buch. 650*), upon which counsel relies:

"Conceding, as we do, that a director may, under such circumstances as are presented in the case before us, become a creditor of his corporation, it followed *ex necessitate* that he

may, for the purpose of collecting his debt, assume a position antagonistic to his company and its stockholders. He may, undoubtedly, bring action against the company and proceed to judgment and execution for the recovery of his debt. But we deem it clear that the director, who is also creditor, must, on taking legal proceedings for collection of his debt, relinquish his trust *pro hac vice,* not covertly, but openly, and with fair notice to his company. Whether such notice should be given to the stockholders or to the directors may depend upon circumstances. If the company is equipped with other officers and directors who are actively representing the interests of the stockholders, it may well be that notice to such officers or directors would be deemed sufficient. But it is, as we think, inconsistent with the duty of a director (at least under circumstances such as are here presented) that he should assume an attitude antagonistic to his company, unless he sees to it that the interests of the stockholders which he, by reason of his personal interest, is for the time disqualified from protecting, are in the charge of other officers and directors able and willing to protect them, and to whom his notice may be given, or else sees to it that fair notice of his contemplated action is given to the stockholders so that they may take measures to protect themselves."

I am unable to find anything in this language that supports in the least the contention of the present appellants. In the first place, I am not prepared to concede that there is the same necessity for a lessee to take a position antagonistic to his lessor that exists where the relationship is that of creditor and debtor. But without stopping to discuss this point, the fatal weakness of Mr. E. C. Hill's position lies in this, that he did not openly assume a position antagonistic to the interests of his *cestuis que trustent.* He did not openly relinquish his trust *pro hac vice,* nor give any fair notice either to the *cestuis que trustent* or to his co-trustee. His policy throughout was to conceal from them the basis of his negotiations with Dunham & Company. When Mr. Case first called upon him and inquired about the property, Mr. Hill at once surmised that he was acting for the Dunham firm, and in response to his inquiry Mr.

Case admitted this. (Mr. E. C. Hill himself so testifies.) He informed Mr. Howell that Mr. Dunham was a prospective buyer, and "asked Mr. Howell if he would take opinions and ascertain a fair price." When Mr. Howell reported, a few days later, the result of his inquiries, the two trustees agreed between themselves that $55,000 should be the asking price. Thereupon Mr. Hill resumed negotiations with Mr. Case and continued them with Mr. Dunham directly, to the exclusion of his co-trustee. It is evident that Hill felt sure from the outset that Dunham would pay much more than $55,000 for the first proposition he (Hill) made to Dunham was at least $20,000 (he himself says $30,000) in excess of what he had just agreed upon with his co-trustee as a proper price to be asked.

He never permitted Howell to know what Dunham's price for the entire property was, and Mr. Howell was in ignorance of the amount paid to Hill for the surrender of the leasehold until the price was disclosed upon the hearing in the orphans court.

Mr. Hill, while he concealed from his co-trustee and from his brothers the state of the negotiations with Dunham, at the same time not only persisted in acting as trustee, but claimed to be acting as a careful and prudent trustee. It appears from his own evidence that during the week that intervened between the signing of the agreements of sale and their delivery, he had a conference with his brothers, on January 13th, at which he submitted a statement (Exhibit A 10) showing the income and outgo and the condition of the estate, made up as of January 1st, for the purpose of demonstrating that a sale at $55,000 would be beneficial to the estate. As he puts it:

"Three of my brothers wanted to know how much I received from the business, but I insisted that it was my own private property; that if I took scrupulous care of the estate, with my own private business I ought not to acquaint them."

And he testifies that during the same week he went about getting written estimates (Exhibit A 11) from various persons conversant with real estate values, placing values ranging

from $50,000 to $55,000 upon the property, with the manifest object of using these papers for the purpose for which they were offered in the orphans court, namely, to show

"that they took every precaution to ascertain what in the judgment of competent men was the real value of that property, so that they might act with due deference to the interest of all concerned."

When we remind ourselves that at the moment of securing those estimates Mr. E. C. Hill had in his pocket agreements already signed evidencing a sale of the property for $75,000, with a check for $500 to bind the bargain, and that he was concealing the facts from his co-trustee and his *cestuis que trustent,* so as to compel the estate to accept $55,000 out of this amount, further comment is superfluous.

Mr. Hill of course knew (the evidence shows this clearly) that Dunham & Company had no desire to buy the leasehold separate from the reversion, and no desire to buy the reversion separate from the leasehold. He knew that what that firm wanted was a clear title to the property with immediate possession. He also knew, what is perfectly obvious from all of the evidence, that any person buying the leasehold only would not pay for it any sum remotely approximating $19,500. He knew from all the circumstances that if the property was to be sold to Dunham & Company at $75,000—a price substantially above its value in the general market if Dunham's firm were not competing—it would be a matter of some nicety, and perhaps of difficulty, to determine how much of that price ought in fairness to go to the estate of T. C. Hill, and how much of it ought in fairness to go to himself, E. C. Hill, or his company. He knew that it was a matter of indifference to Dunham & Company how the purchase price was divided so long as the firm got a good title; and so the separate valuations as embodied in the agreements were no evidence of the market value of the leasehold. He also knew that he himself, by reason of his interest, was disabled from acting as an impartial judge in the matter. Yet he persisted in keeping his co-trustee and his *cestuis que trustent* in the dark; one of the latter, indeed, be-

ing his mother, who through unsoundness of mind was disabled from protecting her own interest, and the others being his brothers, two at least of whom in the clearest manner protested against the course pursued by him in the matter.

It seems to me, therefore, absurd to contend that Mr. Hill is within the rule indicated in the passage quoted from the opinion in the *Marr Case*. By his conduct he rendered it impossible that the interests of the Hill estate should be protected, as against his interests, during the conduct of the negotiations and before the sale to Dunham was consummated. It follows, as of necessity, that his share of the purchase price must in equity be limited to fair compensation for that with which he parted, and that all special profit that arose from the transaction must be given to the estate of which he was the trustee.

Counsel for the appellants criticise the decree under review on the ground that besides sustaining the first exception to the extent of $12,000, out of the $19,500 received on the sale of the property in excess of the amount acknowledged in the trustee's account, the court further ordered that this should be divided and distributed among the residuary legatees named in the will of Thomas C. Hill, deceased, in the proportions provided in the will. This insistence is based upon the fact that the exceptions were filed only by Thomas C. and Raymond D. Hill, and that Harry A. Hill and Lyman P. Hill, the other brothers, have not appeared.

The appellants have failed to include in the record as presented to me any copy of the will of the testator, and I do not know that Harry A. Hill and Lyman P. Hill are among the residuary legatees. Assuming, however, that they are such residuary legatees, and in that manner benefited by the order of the orphans court which requires the $12,000 surcharged against the executors to be passed over to the residuary estate; it does not seem to me that Harry A. and Lyman P. Hill are to be prejudiced at all by the fact that they did not appear in the orphans court or in this court. If their interests are identical with those of Thomas and Raymond, then the latter in presenting and supporting the exceptions were litigating in behalf of their brothers as well as of themselves.

Nor can I assent to the argument that Harry and Lyman are estopped from taking any benefit of the surcharge by reason of the paper already mentioned which they, with E. C. Hill, signed under date January 12th, 1905, addressed to the executors, and expressing approval of a sale of the property for $55,000. When they signed this they were unaware what price could be obtained for the property with due effort, and their assent to the sale at $55,000 did not absolve the trustee from the duty (owing to them as well as to the other *cestuis que trustent*) of realizing as much as possible beyond that sum. To so hold would be equivalent to holding that an express consent to a sale by trustees at $55,000 entitled the trustees to put in their own pockets as a bonus any sum they could realize over and above that amount.

With respect to the first and third exceptions, counsel for the appellants insists that the orphans court had no jurisdiction to determine them, on the ground that in order to do so it was obliged to charge the trustees with moneys that they did not actually receive, and was also obliged to (in effect) set aside as void the lease that had been made by the trustees to the Thomas C. Hill & Son Company.

I have already shown that the moneys were actually received by trustee Hill, and that his responsibility to the estate arises out of his duty as trustee, although the lease be treated as valid.

The orphans court is invested by statute with full jurisdiction over the accounts of executors, administrators, guardians and trustees, with all incidental powers necessary to effectuate this jurisdiction. *P. L. 1898 p. 715 § 2; p. 757 §§ 114–134; p. 765 § 138; p. 767 § 140, &c.; p. 782 § 174, &c.*

It is established that the jurisdiction of that court over the subjects committed by statute to its cognizance is a general jurisdiction, similar to that of the chancery and prerogative courts, and that its authority over the accounts of trustees under wills is as ample as that of the court of chancery. *Pyatt v. Pyatt, 46 N. J. Eq. (1 Dick.) 285, 288; Dunham v. Marsh, 52 N. J. Eq. (7 Dick.) 256, 261; affirmed, 52 N. J. Eq. (7 Dick.) 831.*

It goes without saying that the accounts of a trustee under a will must be stated and settled on equitable principles, according to the truth and substance of the matter in controversy, and

without regard to matters of form. *Woolsey* v. *Woolsey, 72 N. J. Eq. (2 Buch.) 898, 900.*

The cases cited by counsel for the appellants upon the question of jurisdiction do not support his contention.

It is said that the orphans court cannot charge an executor or trustee upon the ground of negligence, to which point *Suydam* v. *Bastedo, 40 N. J. Eq. (13 Stew.) 433,* and *Duncan* v. *Davison, 40 N. J. Eq. (13 Stew.) 535,* are cited. In the former case Vice-Chancellor Van Fleet merely held that the court of equity had jurisdiction under the circumstances, citing, *arguendo,* the latter case, where Runyon, ordinary, held in this court that one executor, who had received no part of the estate, and had separately accounted, could not be charged (at least not in the orphans court) for mere negligence in allowing his co-executor to receive and hold separately the assets of the estate and to waste them by failure to make investments.

*Woolsey's Case, 67 N. J. Eq. (1 Robb.) 574, 579,* is also cited, but the decision of this court there reported (which was rendered on appeal from the orphans court in an `accounting) was reversed by the court of errors and appeals in *68 N. J. Eq. (2 Robb.) 763,* and that court required the account of the executors to be restated in a manner to give effect to an equitable estoppel arising out of the transactions between the executors and the beneficiaries. Afterwards, an attempt being made by bill in equity to open the account as thus restated, it was held by the court of chancery, affirmed by the court of errors and appeals (*Woolsey* v. *Woolsey, 71 N. J. Eq. (1 Buch.) 609; 72 N. J. Eq. (2 Buch.) 898*), that the matter was *res judicata* because of the former decision; that the orphans court had as ample jurisdiction to examine into the account and deal with it on equitable principles as was possessed by the court of chancery, and that the executors might have availed themselves in the orphans court of the matters they set up in the subsequent equity suit as ground for relief. See, also, *Woolsey* v. *Woolsey, 78 N. J. Eq. (8 Buch.) 517; affirmed, 78 N. J. Eq. (8 Buch.) 579.*

The other cases cited for appellants are clearly distinguishable. In *Field* v. *Field, 61 N. J. Eq. (16 Dick.) 154,* the court of chancery took the accounting out of the hands of the orphans court

on the ground that the bill sought to impress a trust upon real estate purchased by the executor, and also sought an accounting of the rents and profits accruing from that real estate. In *O'Callaghan's Case,* 64 *N. J. Eq.* (*19 Dick.*) *287,* the controversy that was sought to be brought into the orphans court was either a mere suit by creditor against debtor, appropriate for the cognizance of a court of law, or was an action to enforce a trust, independent of any accounting under the statute. *Mullaney* v. *Mullaney, 65 N. J. Eq.* (*20 Dick.*) *384,* held that on an application by a widow for a grant of letters of administration the orphans court could not try the question of the validity of a release given by her of all interest in·her husband's estate, if the court could perform its statutory duty without trying that question. *Lippincott's Case, 68 N. J. Eq.* (*2 Robb.*) *578,* held that the statute does not confer upon the orphans court power to determine whether a trustee is properly performing his trust under a will, or to direct him how to perform it. *Ferdon's Case,* 69 *N. J. Eq.* (*3 Robb.*) *762,* had nothing to do with an accounting or any other matter within the jurisdiction of the orphans court.

I conclude that the controversy in the case before me was clearly within the jurisdiction of the orphans court, when it arose in the course of an inquiry into the fairness of the account exhibited to that court by the appellants.

There is no defect of parties. Even if the T. C. Hill & Son Company could be treated as having any existence for present purposes independent of Mr. E. C. Hill, the rights of the company will not be affected by any decree made herein. Moreover, if the company is a necessary or proper party to the controversy, the trustees cannot object on that account, for it was they who brought the accounting before the orphans court, with plain notice, as evidence shows, that they would be called to account by the exceptants with respect to the matters that form the subject of the first exception.

I think, therefore, that the orphans court was right in holding that Mr. E. C. Hill could not retain out of the purchase-money received from Dunham any sum beyond that which would fairly compensate him for the loss he incurred through the surrender of his leasehold and the disturbance of his business incident thereto.

Indemnification for this disturbance of business and the loss upon the sale of fixtures, &c., may fairly be allowed as an expense reasonably incurred in making the property ready for sale to Dunham; and since that sale was negotiated at a price substantially above what would have been the market value except for Dunham's special need for the property, it was reasonable for the trustees to go to special expense in order to secure the bargain.

It is contended by the appellants that even on the theory of compensation the order under review does not make adequate allowance. But this contention is not supported by any analysis of the evidence sufficiently exhaustive to enable me to form a satisfactory judgment upon the question; and my own examination of the evidence leads me to the view that the result reached by Judge Rellstab, upon grounds elaborately stated in his opinion, is at least not manifestly erroneous. As the learned judge points out, he made a special request for evidence to elucidate this question; yet, as the record shows, the evidence submitted was in some respects quite unsatisfactory. Upon the whole, I cannot see any sufficient ground for disturbing his finding at the instance of the appellants.

The respondents in their argument attack the credits allowed to the accountants against the $19,500, only upon the fundamental ground of the alleged invalidity of the lease from the trustees to the Hill company. Their contention in this behalf I have overruled on the ground of estoppel. They do not raise any particular question respecting the propriety of the credits allowed by Judge Rellstab to the accountants if the lease is to be taken as valid.

The opinion points out, however, that the computation that was carried into the decree contained an error to the extent of $500 in favor of the accountants. This error should be rectified in this court upon the cross-appeal of the respondents.

The only remaining question is that exception which dealt with the claim of the accountants for an allowance of $1,375, for commissions paid to Case & Cain, the real estate brokers, through whom the property No. 11 North Broad street was sold. Upon this question I concur in the views expressed by Judge Rellstab, and have little to add. The evidence renders it plain that Case

& Cain were employed by Dunham & Company, and not by the trustees, and that there is no reasonable ground on which the trustees can justify payment of such commissions out of the estate.

Thus far I have not dealt with the question whether Mr. Howell is responsible to the estate with respect to the matters involved in the first and third exceptions.

Upon this subject the rule established by our decisions, as I understand it, is that each trustee must exercise reasonable diligence with respect to his approbation of and acquiescence in the acts of his co-trustee. *Laroe* v. *Douglass, 13 N. J. Eq. (2 Beas.) 308; Schenck* v. *Schenck, 16 N. J. Eq. (1 C. E. Gr.) 174, 184.* It has been held to be the duty of one trustee to protect the trust estate from any misfeasance by his co-trustee, upon being made aware of the intended act, by obtaining an injunction against him. *Crane* v. *Hearn, 26 N. J. Eq. (11 C. E. Gr.) 378, 381; Smith* v. *Pettigrew, 34 N. J. Eq. (7 Stew.) 216, 218; Bechtold* v. *Read, 49 N. J. Eq. (4 Dick.) 111.*

The rule that for some time obtained in this state, that where executors jointly settled their final account and the orphans court adjudged that a certain balance was due from them, such decree was by force of the statutory provision now found in *P. L. 1898 p. 761 § 127,* conclusive evidence as to their joint liability for the balance thus ascertained, was overruled by the court of errors and appeals in *Weyman* v. *Thompson, 52 N. J. Eq. (7 Dick.) 263.* The present accounting is not by executors as such, but by trustees; and it is not in its nature a final accounting. It is, however, a joint accounting, and the decree thereon would seem to be *prima facie* evidence of the joint liability. It may therefore be reviewable on appeal in this respect.

As to the transactions that are under inquiry on the first exception, it seems to me the conduct of Mr. Howell was such as to render him, as well as his co-trustee, liable to the estate. Mr. Howell was well aware that Mr. Hill had a personal interest at stake in the conveyance of the property to Dunham & Company, and that such personal interest was antagonistic to the interests of the estate. For the very reason that Mr. Hill was thus disabled from impartially representing the estate in the matter, it was

the more incumbent upon Mr. Howell to be vigilant and prudent, to the end that the interests of the estate should be fully conserved. He was charged with notice, and I am inclined to think, from the evidence, that his mind was impressed with the fact, that it was probable his co-trustee, in his keenness about "looking out for himself," would sacrifice the interests of the estate. Yet Mr. Howell, after a few perfunctory inquiries respecting the market value of the property, gave his assent to a sale at $55,-000, without making the least effort to ascertain what Dunham & Company would probably pay. And he then turned over the conduct of the remaining negotiations to his co-trustee, without even making it his business to ascertain what Hill was getting for his own interest, although he knew that Hill was bargaining for the transfer of that interest to Dunham, together with the interest of the estate. Not only this, but Mr. Howell was personally appealed to, pending the negotiations, by Mr. Raymond D. Hill, and Mr. Howell answered that he knew nothing about it and referred him back to his brother Edmund.

It is plain, I think, that Mr. Howell knew there was something wrong about his co-trustee's mode of conducting this business, and it seems to me he was so grossly negligent as to practically connive in the breach of trust.

Under these circumstances he is properly to be held liable jointly with the delinquent trustee. Beside the cases above cited, reference may be made to *28 Am. & Eng. Encycl. L. (2d ed.),* tit. "*Trusts and Trustees,*" *1070,* and to an interesting and exhaustive note in *11 L. R. A. (N. S.) 296,* to the case of *Cheever* v. *Ellis, 144 Mich. 477; 108 N. W. Rep. 390.*

With regard to the surcharge for profit gained by E. C. Hill through his sublease to Dunham & Company (the third exception), I think Mr. Howell is likewise jointly liable with him to the trust estate. Mr. Howell's own testimony shows that he actively participated in the making of the leases to Hill's company, and had personal knowledge of the change that resulted in the final lease. Indeed, it is quite plain that Mr. Howell's duty required him to take an active interest in these transactions in which his co-trustee was personally interested. Presumably, he knew of the sublease to Dunham & Company, and there is no evi-

dence that he did not. Indeed, it is not contended that Mr. Howell is not responsible to the estate as well as Mr. Hill.

As between themselves, the question of proportionate liability is reserved by the decree, and this of course includes the order of liability. See *McCartin* v. *Traphagen, 43 N. J. Eq. (16 Stew.) 323, 335; affirmed, McCartin* v. *McCartin, 45 N. J. Eq. (18 Stew.) 265.*

The decree under review, so far as appealed from by the trustees, will be affirmed, with costs. Upon the cross-appeal it will be reversed by adding $500 to the surcharge under the first exception, as above noted; and upon this appeal the order will be modified with respect to its recitals, so that instead of showing that upon the sale $20,000 was paid by the purchaser to the Thomas C. Hill & Son Company, it will show that $19,500 was paid by the purchaser to the respondent Edmund C. Hill.

The respondents are entitled to their costs.


APPENDIX.


RELLSTAB, J. Thomas C. Hill and Ray D. Hill, two of the sons of the late Thomas C. Hill, deceased, and beneficiaries of the last will and testament of the deceased, have filed three exceptions to the third account of Edmund C. Hill and Charles W. Howell, trustees of said will. The exceptions are as follows:

"*First.* On June 29th, 1905, the accountants charge themselves with the receipt of cash from S. P. Dunham proceeds of sale of 11 North Broad street $55,000 (less two and one-half per cent. if paid in cash), $53,625, whereas said trustees, these accountants, received a much larger sum of cash from said S. P. Dunham, for said premises No. 11 North Broad street, which premises belonged to the estate of Thomas C. Hill, deceased, and with which the said trustees should have charged themselves in said account, but the exceptants do not know the exact amount received by said trustees. these accountants, for the reason that said trustees, these accountants, although often requested by the exceptants so to do, have nevertheless failed and refused and still do refuse to inform the exceptants of the exact sum received by them from said S. P. Dunham for said premises No. 11 North Broad street.

"*Second.* For that the said accountants have credited themselves in their said account with the sum of thirteen hundred and seventy-five dollars, commissions paid to Case & Cain, real estate agents. for selling the

35

property of the estate; whereas, by law, the said executors and trustees were obliged to perform the service of selling without compensation to agents therefor.

"*Third.* For that the said accountants should be charged with the sum of six hundred dollars per year, the difference between the rent for part of the premises of the estate leased to one of themselves, Edmund C. Hill, at two hundred dollars per year, and the price he, said executor, obtained for himself from S. P. Dunham & Company to whom he assigned or sublet his term therein, at eight hundred dollars per year, to wit, from January first, nineteen hundred and three, to April thirteenth, nineteen hundred and five, namely, fourteen hundred and twenty-one dollars and sixty-seven cents."

*First.* As to the exception which challenges the payment of $1,375, as a commission to the real estate agents for selling the testator's property. By the will the trustees were authorized to sell the premises No. 11 North Broad street either at public or private sale, but with this limitation, that it should not be sold during the lifetime of the widow for less than $45,000. The property was sold for $55,000 at private sale to S. P. Dunham & Company.

It is the duty of executors to preserve the estate and administer it without unnecessary expense. In such administration they are allowed for actual expenses, and a commission as compensation for their services. Sections 128 and 129 Orphans Court act (*P. L. 1898 p. 715*). Such expenses, however, must not only be actual, but reasonably necessary in transacting the business of the estate. They must have been necessary or incurred for the benefit of the estate. On a sale of the testator's land the intervention of a broker may or may not be necessary. If not necessary, the brocage paid will not be allowed, unless it can be shown that by employing a real estate agent the estate has been benefited in a pecuniary sense to at least the amount of the expense incurred by such employment. Whether the intervention of a real estate agent in making the sale was necessary or beneficial to the estate, depends upon the facts of the particular case. The property to be sold may be of such a character, or so situated as to require the aid of one possessing greater skill or knowledge concerning real estate transaction, than that possessed by ordinary persons. In such a case the employing of such an agent would be beneficial to the estate; in fact, the failure of a trustee to avail himself of such

special skill and knowledge might result in a serious loss to the estate.

In passing upon such employment, the test on the question of compensating the agent out of the estate is, was it necessary or was it to the interest of the estate? If it was, the expenses thus incurred are allowed; if not, they will be disallowed. Upon this question the burden of proof is upon the accountants. For New Jersey cases on this subject see *& N. J. Dig. Ann. Div. Ex'rs & Adm'rs* § *92.* And for cases in other states see *7 Am. & Eng. Encycl. L. 431; 18 Cyc. 272,* and cases noted in *64 L. R. A. 554.*

Applying this test to the facts in this case, the brocage paid cannot be allowed. For several years previous to such purchase by the firm of S. P. Dunham & Company, it rented the rear of said premises, using it as a means of access between its properties fronting on Broad street to the north of the testator's property, and those fronting on State street to the south thereof, the whole being used by said firm in carrying on what is known as a general department store. Such rear part of testator's premises was first leased to said firm by the testator, later by the trustees, and last by the corporation known as the Thomas C. Hill & Son Company, which, at the time of the execution of the last lease, was the lessee of the whole of such premises.

From this recital it is apparent that the testator's premises bore a peculiar relation to the premises occupied by Dunham & Company. The trustees knew the nature and character of the business of said company, the use which was being made of that portion of the testator's premises which it had leased, and the peculiar relation which the testator's premises bore to that occupied by said company. Under the facts in this case, the likelihood of said company's becoming a prospective purchaser of No. 11 North Broad street was more than a mere possibility. Several years previous to the sale it had manifested a purchasing interest in said property. Negotiations were opened by it directly with the trustees, but nothing came of them because of the company's unwillingness to pay the minimum price fixed by the testator's will. There was no necessity pressing upon these trustees that required an immediate sale of the premises. When, in the judgment of

the trustees, a sale of such premises was advisable, the course that prudence as well as the logic of the situation suggested, was to approach Dunham & Company, which, by reason of the peculiar conditions referred to and its previous inquiries regarding the purchase of such premises, would seemingly be the most likely purchaser. The intervention of an agent to interest it in a possible purchase would not be necessary. No agent could have greater knowledge of the conditions which would make such company a likely purchaser than that possessed by the trustees. No skill in handling negotiations for sale greater than that possessed by the trustees was required in this particular case. If, therefore, the initial steps to effect a sale of said premises was to be taken by the trustees, the obvious course for them to pursue to save the estate unnecessary expense, was to notify said company that the premises were to be sold. But in this case the initiative was not taken by the trustees. The estate's exigencies were not such as to require immediate sale. They could well wait upon the needs of others. In Dunham & Company the estate ever had a prospective purchaser. A glimpse of this company's own conception of its need for a part of the premises was obtained by one of the trustees when this company voluntarily offered to increase the rent fourfold when a renewal of its lease was refused. No one else, seemingly, could have as great a purchasing interest in said premises. Probabilities so obvious would occur to men of such known business sagacity as these trustees, who were familiar with such conditions. At any rate, whatever the reasons, the trustees did not seek a purchaser, but the purchaser sought them. Both Mr. Dunham and trustee Hill testified that the real estate agents were first brought into the negotiations for the sale by Mr. Dunham. It was the purchaser seeking to buy, and not the trustees seeking a purchaser, that first interested the agents in such negotiations. Aside from the payment of the agents' commission by the trustees, there is nothing in the case that suggested that the agents were working for the interests of the estate. I fail to see anything in the case that shows that to effect this sale there was any necessity for the employment of an agent by the trustees, or that by the intervention of such agents the estate has been benefited; the result is that the payment of $1,375 as commis-

sions to the real estate agents for selling No. 11 North Broad street must be disallowed.

*Second.* As to the exception seeking to charge the accountants with the sum of $1,421.67, said to be the difference in rent received by Edmund C. Hill from S. P. Dunham & Company, and that accounted for to the estate. For a number of years prior to the 1st day of April, 1900, the firm of Dunham & Company occupied the rear of the premises No. 11 North Broad street under a lease from the trustees, paying therefor as rent, $200 per annum. During the same period the rest of said premises was occupied by a corporation known as the Thomas C. Hill & Son Company, under a lease from such trustees. On April 1st, 1900, Dunham & Company's lease expired, and from that date the Thomas C. Hill & Son Company, under another lease from the said trustees, rented the entire premises, including that theretofore leased to Dunham & Company, paying an additional sum of $200 as rent, this addition being the same as theretofore paid by said Dunham & Company for the rear part of the premises as aforesaid. The testimony is contradictory both as to the time when Dunham & Company ceased paying rent direct to the estate and when Hill & Company took over the entire premises. The year is fixed by trustee Hill both as 1900 and 1903. This latter date is clearly a mistake, as the lease corroborates his testimony that such time was 1900.

The accountant Edmund C. Hill was the principal stockholder of the Thomas C. Hill & Son Company. His testimony shows that out of six hundred shares of the capital stock of such company he owned all but two or ten of them. After April 1st, 1900, Dunham & Company continued to occupy the same part of the premises. This occupation for a time was without rent, but from and after January 1st, 1901, the occupation was under a lease from said Thomas C. Hill & Son Company, at a rental of $800 annually. It is this difference between the $200, the increased price paid by the Thomas C. Hill & Son Company, and the $800 which it received from Dunham & Company for the said rear part of the premises, that these exceptants seek to charge against these accountants.

The position of trustee is one of trust and confidence; and it

is a fundamental principle in regard to trust estates that the trustee cannot use the trust property, nor his relation to it, for his own personal advantage. All the power and influence which the possession of the trust property gives must be used for the advantage and profit of the beneficial owners, and not for the personal gain and emolument of the trustee. *Perry Trusts (5th ed.)* § 427; 28 Am. & Eng. Encycl. L. (2d ed.) 1016; Bohle v. Hasselbroch, 64 N. J. Eq. (19 Dick.) 334. On the face of the evidence, it is plain that Dunham & Company gave $600 more a year to the Thomas C. Hill & Son Company, of which the accountant Hill was substantially sole proprietor, than such lessee gave for the same premises to the trustees of the estate. Why did not the estate get the benefit of this fourfold increase? There is nothing in the case to indicate that Dunham & Company was not desirous of continuing in possession of the leased premises, or that it derived any additional benefit by leasing from the Hill company rather than from the Hill estate; and if it was subsequently induced, as it was, to pay this increased rent to the Hill company, what is there in the case to negative the inference that it could have been induced to pay the same rental to the estate? The accountant Hill was the active and dominant factor in the management of both the estate and the Hill company. Why should he not have used the power and influence he possessed in favor of the trust estate rather than for his own company? The change in the relation of landlord and tenant, as it existed up to April 1st, 1900, was made at his suggestion, the result of such changed relation was to his pecuniary benefit and advantage, and the burden is upon him to show that this increase in rent could not have come to the trust estate even though such change in the relation of landlord and tenant had not taken place. The accountant Hill testified that he conducted a bakery and confectionery at No. 11 North Broad street, and that after Dunham & Company had rented the rear of the premises said company occupied it as a candy department, which came into direct competition with his confectionery business, to his detriment, and that when he suggested that the Hill company should rent the entire premises, it was, in part, to protect himself against any competition, and also to get more room for his own business, which was increasing.

Assuming that the reasons for this suggested change in the leasing of the premises, as stated by Mr. Hill, are correct, and that at the time he suggested such change he had no thought of re-renting the rear portion to Dunham & Company, and that it was fully his intention to occupy it in the Thomas C. Hill & Son Company's business, the fact still remains that by his subsequent change of plans, and the subleasing of that part to the old lessee, he secured from it a very large advance in rental over that which the company had been paying to the estate when it rented directly from the trustees. It is ever the duty of the trustee to be alert in the interest of the trust estate. When a person accepts the duties of trustee he, in all his dealings with the estate, is required to make his own interests subordinate to the interests of the estate. To such extent is this duty pressed upon him by the courts, that he is not permitted to put himself in a place where he may be tempted to advance his own interests over that of the trust estate. In *Staats* v. *Bergen, 17 N. J. Eq. (2 C. E. Gr.) 554,* the court of errors and appeals laid down such duty in the following language:

"It is the universal rule that a trustee must not put himself in a position in which he will be tempted, from the influence of self-interest, to take advantage of his *cestui que trust.*"

And the late Chief-Justice Beasley, in the opinion written in that case, on this subject, said:

"The rule is one of public policy. The trustee is not prevented * * * on the ground simply of a supposition of actual fraud, but because the law has established, as an inflexible rule, applicable to every emergency, that he shall not place himself in a suituation in which he will be tempted to take advantage of his *cestui que trust.* This is a wise public regulation, intended to protect a species of property which, otherwise, would be constantly exposed to peculiar hazard. The trustee, therefore, must submit to this regulation, and if he does an act in violation of it, no matter how pure his intentions may be, such act is voidable at the instance of the person whom he represents. * * * The *cestui que trust* is not bound to prove that the trustee has made a bargain advantageous to himself. The fact may be so, and yet the party not have it in his power distinctly and clearly to show it."

The present case is, perhaps, a good illustration of how a trustee who may be assumed to be perfectly innocent of any intention to use his influence as trustee for his own advantage, places himself in a position where, by subsequent developments, he is enabled to pocket a profit which should have been turned into the estate. Trustee Hill took possession of the whole premises on the plea, in part, that he needed more room in his business. How great this need was may be judged by the fact that he never took possession of the added part, but allowed Dunham & Company to continue in possession for some months. True, this possession for some months was on sufferance. The right to dispossess existed, however, and both the old and the new lessees knew full well what a loss would fall upon Dunham & Company if it were dispossessed, and the intercommunication between its several business departments prevented. The possession of this rear strip was vastly more valuable to Dunham & Company than it could have been to Hill & Company. The former could well afford to pay a larger rental therefor than the latter or anyone else. Trustee Hill was well aware of that fact, and if the advantage which the estate possessed in that particular, was to be pressed against Dunham & Company, the estate, and not the trustee, was entitled to it. When the trustee learned that Dunham & Company was prepared to pay $800 a year instead of $200 for the same premises, and he was willing to forego his purposes of occupying it, it was his duty to turn over such increased rent to the estate, regardless of the fact that he had good business reasons for including such rear part in his new lease or that by surrendering his rights to possess such part he sustained some loss. The rule is inexorable. As was said by the court in *Staats* v. *Bergen, ubi supra* (at *p. 559*) : "The rule, to be efficacious, must be general, and the law implies, therefore, that in all cases of trusts, such opportunities may exist, and, consequently, the prohibition is universal, that he may not do anything which, while it is an advantage to himself, is, or may be, a loss to the trust estate. So jealous is the law upon this point that a trustee may not put himself in a position in which to be honest must be a strain upon him. The general rule, therefore, applies, not merely in those cases in which the

confidence is absolutely betrayed, but when the circumstances are such that there was a temptation to violate it."

The moral standard thus raised by the law in the administration of trust estates may be in advance of the ethical standard deduced from the average of commercial transactions, but that is no reason why it should be lowered or abandoned because in a given case the trustee may not be guilty of moral culpability. The fact that the trustee took to himself the profit made possible because of the strategic position the premises of the estate occupied with relation to the properties and business of Dunham & Company, using the language in the last-cited case, "was in itself a breach of trust, and it would be a violation of principle to suffer the trustee to take any gain from such misconduct." In the presence of such a condition of facts, the query whether the trustee acted innocently is *aliunde* this question.

The trustees not having accounted for the extra $600 a year received from Dunham & Company during the period that trustee Hill leased said premises at that increased rental, their account must be surcharged with said difference in rental. The testimony shows that this period began January 1st, 1901, and ended with the delivery of possession of the entire premises on July 1st, 1905, a period of four and a half years, making the surcharge $2,700, and not $1,421.67 as stated in the exception.

*Third.* As to the exception which charges a failure to account for all the consideration received on the sale of the premises No. 11 North Broad street. The reversion was sold by the trustees to S. P. Dunham & Company for the sum of $55,000, less two and a half per cent. for cash. The actual amount received was $53,-625. At the time of the sale the purchaser was in possession of a part of the premises, as a subtenant of the Thomas C. Hill & Son Company, which had a lease from the trustees covering the entire premises, under which the lessees had the option of extending the demised term to January 1st, 1908.

The testimony shows that after several unsuccessful attempts on the part of S. P. Dunham & Company to negotiate a purchase of said premises, two written agreements to purchase were entered into on the 14th day of January, 1905. One of these was between the trustees and Dunham & Company, and was for the

purchase of the reversion and contained a stipulation that the vacation and release of said property by the Thomas C. Hill & Son Company should be made a part thereof; the other was between the said purchaser and the Thomas C. Hill & Son Company, and was for the transfer of the possession of said premises and for a release of all claims that the said Thomas C. Hill & Son Company had or might have in said property. This latter agreement recited the agreement with the trustees, and was made dependent upon the sale of the reversion. These agreements to sell were consummated, the purchaser paying over to the trustees $53,625 for the reversion and to the Hill company $19,500 for the possession and all its rights under the lease.

The exceptants contend that the lease to the Hill company was invalid; that trustee Hill was practically the proprietor of the company, owning all the shares of its capital stock save the few necessary to give it legal existence; and that the lease to it was practically a leasing by the trustee to himself and therefore illegal. They also contend that even if a leasing to said company were legal, the trustees could not grant a term beyond the date that a sale of the premises became necessary; and that as neither trustee Hill nor the corporation had any possessory title to sell other than that which they had illegally derived under such lease, such payment was nothing more or less than a bonus or royalty paid by the purchaser to get immediate possession, and could not be retained by said Hill or his company, but must be turned over to the estate.

The accountants, on the other hand, contend that the reversion was sold for all it was worth; that the total amount of the purchase-money received therefor had been turned into the estate and accounted for; that the lease made to said company was within the powers of the trustees, and valid; that the lease was the property of the said Thomas C. Hill & Son Company, and that the estate had no interest in what the lessee obtained as a consideration for the surrender of the unexpired term of the lease.

The contention here raised must be settled by the application of the principle heretofore announced and followed in determining the exception last considered.

By the sixth item of the testator's will, he created a trust of all his property, both real and personal, and directed the application of all the rents and profits thereof, first, for the support of his wife and minor children during her lifetime, and second, the payment of a life annuity to a friend. The will gave full power of sale, stipulating, however, that no sale of the premises in question should be made during the lifetime of his wife for less than $45,-000. It is apparent that in the execution of these trust powers the trustees had authority to lease these premises. In fact, the evidence makes it very plain that the testator's wishes in the creation of these trusts could not have been fully carried out without a sale or letting of these premises, and that as the power to sell during the widow's life was restricted in respect to the price, the trustees were required to lease said premises until the authorized sale could be made. The evidence also discloses that these premises had been occupied as a bakery for many years prior and down to the testator's decease. The trustees leased the premises for the same purpose, and it was so occupied continuously until the time of the sale, the last lease having about three years to run at the time of the execution of said agreements.

Whether trustees, in leasing, would be justified in granting terms of several years' duration, depends upon the terms and purposes of the trust. The cases on this subject are not numerous. The greater number are cited and discussed in *Hubbell* v. *Hubbell, 135 Iowa 637; 13 L. R. A. (N. S.) 496.* In this case Mr. Justice Todd summarized them as follows: "*First.* The trustees may lease for such reasonable terms as are customary and essential to the proper care of and to procure a reasonable income from the property. *Second.* Such terms should not, save on showing of reasonable necessity to effectuate the purposes of the trust, extend beyond the period the trust is likely to continue. *Third.* Should they extend unreasonably beyond such period, the excess only will be void. *Fourth.* Only upon a showing of such reasonable necessity when not given such power by the instrument creating the trust will the trustees be authorized to bind the estate so as to effectually deprive those ultimately entitled thereto of the property itself." In the management of a trust estate, it is fundamental that while the interests of all the parties are

to be consulted and conserved, the purposes of the trustor are paramount.

In the present case the real estate itself was not to be turned over to the remaindermen at the conclusion of the intermediary estates. Before the remaindermen took, the properties were to be converted into cash. As already stated, the power of sale during the widow's life was limited by the minimum price fixed, and the evidence leaves no doubt that for many years such limitation operated to prevent a sale. Leasing the properties, therefore, was the only means to derive the income required to carry out the trust provisions. The evidence shows that the income derived from the properties at the time of the testator's death would have to be increased if all the terms of the will were to be carried out.

Confronted with the need of increased revenue, and restricted to leasing as the means of obtaining it, the direction of the lease, as well as the uses for which such premises were best adapted, were of the utmost importance. The premises had been used as a bakery, restaurant and confectionery for many years. For the purposes of the former it had been equipped with large bricked-in ovens. To a baker, restaurateur and confectioner such equipment and good will would appeal, and a renting for such purposes was reasonably calculated to produce a greater income than if the premises were rented for any other purpose.

To secure such a tenant the duration of the lease would be an important consideration. The interests of the tenant as well as the landlord would have to be considered. To make the term defeasible on sale of the property would place the tenant at the mercy of a contingency, the happening of which would be beyond both his control and probable cognizance. No business man would submit to such an exaction, except at a low rental. A month to month rental would be out of the question, and one from year to year little better in securing the higher rent, besides being capable of extending the term beyond the time of sale. If without a lease for a reasonable number of years the rental required to meet the trustor's purposes could not be obtained, and such a lease would do so, it would be the duty of the trustees to grant such a lease, unless by so doing the cash value of the prem-

ises at the time when the authorized sale would be made should. be substantially depreciated.

In leasing the property some time had to be fixed. It was not. fixed by the will. In view of the limitations and terms imposed by the trustor himself, and the exigencies in handling an estate of this character, it must be presumed that leases for a reasonable number of years were in the contemplation of the trustor.

In my opinion the leases made by the trustees, so far as their duration is concerned, are in accord with the customs and methods prevailing among prudent persons in like enterprises, and were necessary to the accomplishment of the purposes of the trust. If in this case the lease had been made to a corporation in which neither of the trustees had any pecuniary or beneficial interest, and the trustees had sold the premises subject to the lease,. the mere fact that said tenant had, by reason of such long term lease, been able to make profit by a sale of the unexpired term, would not have justified the charge that the trustees had abused their trust or wasted the estate. In the present case, however,. Edmund C. Hill, one of the trustees, was, as already stated, practically the lessee. He owned all the issued shares of the capital stock of the Thomas C. Hill & Son Company other than the few that were needed to effect the incorporation. The leasing by the trustees to such corporation was to all practical intents and purposes the same as if the lease had been made to the trustee Hill himself.

Because of this it is insisted that the lease was invalid. The facts in this case do not permit the application of this rule. For some years before the testator's death he and his son Edmund (the trustee in question) had carried on the baking, confectionery and restaurant business in copartnership, using these premises. for such purpose.

After the death of the father the son bought the interest of the deceased, and continued the business at the same place, such purchase being provided for in the articles of copartnership. The copartnership articles indicate that the trustor contemplated the possibility of his son being the executor of his will. The will creating the trust was executed during the continuance of this copartnership. By this instrument his partner was made the sole

trustee; another was added by the codicil made shortly before the testator's death. In accepting the trust the son was respecting his father's wishes, and by purchasing his father's interest in the copartnership business he was but exercising the right secured in the agreement made with his father. The leasing by the trustees first to himself and subsequently to a corporation practically owned by him, were in no way inimical to, but, under the conditions affecting the trusts, rather for the best interest of the trust estate, and the acts of the trustees in making these leases were justified.

It was never objected to, so far as appears, by any of the *cestuis que trustent,* that one of the trustees or his corporation was a lessee, though they were fully cognizant that such was the case. The trustees have accounted several times, and until the exceptions filed to the present account no objections were made to their conduct in any respect. The failure to object to past accounts, as well as the character of the objections originally made to the allowance of the present account, evinces that the fact that one of the trustees was himself or his corporation was the lessee was not objectionable. However, the assumption by Edmund C. Hill of the dual relation of trustee and lessee, beneficial as it was to the estate at its inception, brought him within the rule that required him to make his own interests subordinate to the interests of the trust estate. In the administration of the Hill trust a sale of the premises at some time would have to be made. The time of sale was not arbitrarily fixed by the trustor. It was left to the discretion of the trustees, subject only to the aforesaid price limitation during the widow's life. During the entire time covered by the present account the widow was alive. For many years the price fixed by the testator was prohibitive of a sale. There is nothing in the case that suggests that at the time trustee Hill assumed such dual relation he was actuated by any motive to make his interests paramount to that of the trust estate. Neither is there anything in the testimony that indicates that at the time of the making of the last lease the trustees knew, or should have known, that before the expiration of such intended lease a sale was likely. Before the execution of such lease the subject of sale had been broached by Mr. Dunham and a Mr. New,

but the price limited by the testator was considered too high. These negotiations—the only ones indicating a likelihood of sale —tend to establish that there was no more likelihood of a sale at the limited price during the term of the proposed new lease than there had been during the term then closing.

I am of the opinion that the execution of the last lease was, under all the circumstances of the case, a proper exercise of the trust power, notwithstanding that one of the trustees was the practical owner of the lease, and that during the leased term a good, and I might add, rare opportunity for sale presented itself. This conclusion, however, does not dispose of the exception now considered; for the question, when reduced to the last analysis, is not whether one of the trustees could take a lease, but rather will he be permitted to use the position gained by the lease to further his own interests. In the administration of a trust it is the duty of the trustee to keep himself clear of those entangling alliances which tempt to make the interests of the *cestui que trust* subordinate to his own. And if he innocently enters into a relation which may conflict with that high standard of service required of trustees, it is his duty, when such conflict appears, to disassociate himself from one or the other of such relations. If he fails to do so, and it is made possible for him while occupying this dual relation to receive for himself a benefit which might have been obtained for the estate if such dual relation and interest had not existed, and he appropriates such benefit, he holds it for the estate.

The negotiations for the sale came at a time when the lease had three years to run. They were opened with trustee Hill by a representative of Dunham & Company. The peculiar situation of Dunham & Company's properties in relation to the Hill property, and the business needs of the Dunhams for more room, have already been stated in considering the second exception, and need not now be repeated. It is sufficient here to say that immediate possession, with the taking over of the title, was undoubtedly a controlling factor in influencing the purchaser to pay the price that was paid to secure the property.

It was at the time of the negotiations for sale that the dual relation occupied by the trustee became conflicting. At this point

his interest as lessee became antagonistic to his duties as trustee. As trustee he must not assume an attitude that would prevent a. sale, or appropriate any of the consideration that the buyer was willing to give for the property. Being in possession under a valid lease he was entitled to adequate compensation for any loss incurred by a removal and relocation of his business; but he was not entitled to any more. If he were not trustee he could refuse to vacate till the end of his term, and make the best terms possible with the trustees or prospective purchaser for a surrender of his lease. The right of possession would be a valid asset, the commercial value depending entirely upon the needs of the prospective purchaser for that particular property. But whatever the value and by whomsoever paid, it would come out of the estate. It is absurd to contend otherwise. If the control of the possession were in the estate, the amount paid would go to it permanently; if it were in another party, it would eventually go to such party, and this, irrespective of whom the purchaser paid it to in the first instance, and in either event the estate would lose it. For the purchaser, whatever his needs, would give only so much wherever it went. Reversion and immediate possession each has its value, and whether lumped or separated the result to the purchaser and the estate is the same. To exact more for the vacation of the premises than an adequate reimbursement for losses incurred, might be perfectly legal if done by one not a trustee; but a trustee, though also a lessee, may not do so. His paramount duty is to conserve and advance the interests of the estate, and not to exploit it for his own benefit, nor to continue in a relation to the estate when his self interest will lie with his duty to the trust. To succeed in obtaining a larger sum for the vacation of the premises than commensurate with the losses incurred in surrendering the lease would mean nothing more or less than withdrawing that amount from the estate, for, as trustee, he could have secured it for the estate as easily as for himself. His dual relation gave him an advantage that he would not have otherwise possessed. As trustee his duty was to secure all that Dunham & Company was willing to give. The more he demanded as payment for his right as lessee, the less could be expected to be given for the reversion by the purchaser. And the mere allowing his co-

trustee to fix the price for the reversion would not absolve him of his duty to secure more if more could be had.

Trustee Hill was now in a position where personal interest vied with duty. Human nature is not constituted to meet such a strain, and it is for that reason that the courts insist that a trustee must keep himself clear of such dual or antagonistic relations, or clear himself of them when they become inevitable.

From the evidence it appears that trustee Hill himself recognized the need of abstaining from fixing the price of the real estate, for he called in his co-trustee and asked him to ascertain what the real estate was worth, before a price should be named to the prospective purchaser.

This, clearly, it was his duty to do; and probably nothing more would have been required of him had such prospective purchaser not required that with the title he should receive immediate possession. The price named by his co-trustee after consulting with men having knowledge of the general conditions affecting values of properties in the same neighborhood was the highest given him by any such persons. It is to be noted that this price is $10,-000 more than the minimum fixed by the trustor, and considerably more than that above the highest price that had theretofore been offered for such premises.

Candor compels the admission that as far as general conditions affecting the value of properties in that neighborhood were concerned, the price named was a good one for the estate. But the estate was entitled to not only what a purchaser would give, having no special reason for buying, but what one having special needs to meet was willing to give, if known to the trustees. Such special needs existed in this case, and trustee Hill knew of them. In submitting the figures obtained from his co-trustee, to the agent of Dunham & Company, he stated that the property would be sold subject to the lease, and that if it wanted to buy the lease he would be willing to enter into negotiations for that also. The purchaser would not take the property unless it was cleared of the lease.

Confronted with this ultimatum the plain duty of trustee Hill was to acquaint his co-trustee with all the facts in his knowledge bearing upon the prospective purchaser's needs for this par-

ticular property, withdraw from the negotiations and offer to surrender the lease upon being reimbursed for the loss his company would incur on such surrender and removal from the premises. He did none of these. He did not divulge to his co-trustee any part of his knowledge of the reasons which impelled Dunham & Company to seek the ownership of this property. He relieved his co-trustee from any active participation in the negotiations for the sale, and managed that himself. He personally negotiated with Dunham & Company for the sale of the lease, &c. He first asked of Dunham & Company the sum of $30,000 for the Hill company's stock, trade fixtures, good will and lease. To Dunham & Company these two propositions to buy, one for the reversion and the other for Hill & Company's business and lease, presented themselves as one. It declined to buy such stock and business, but did agree to buy the lease. The reversion with immediate possession, and not Hill & Company's business, was wanted. Separate agreements were made, one relating to the reversion and the other to the possession. The proposition that Dunham & Company had to settle, however, was not how much the possession was worth as against the reversion, but how much was the whole thing worth to them, and it was so considered by it. Mr. Dunham's testimony on this point is significant. He said, in answer to a question by the court, "There was only one price paid, $75,-000." And in answer to a question by the counsel for the accountants, he said, "The price was given us in gross." And in answer to the further question, "Was it not afterward divided?" he said, "Yes, sir; in these articles of agreement. I didn't know there was going to be two articles of agreement drawn up at that time." His other testimony on this subject is to a like effect. The entire negotiations with Dunham & Company from the time of the submission of the figures obtained by trustee Howell were carried on by trustee Hill. None of the details of the result reached were communicated to the co-trustee, who was kept in ignorance of the sum received by Hill & Company till disclosed at the hearing in this case.

There is no contention that Dunham & Company would have paid $20,000 for a lease having less than three years to run and a bricked-in oven of doubtful value, without also obtaining the re-

version. Under the pressure of business needs Dunham & Company was induced to pay $75,000 for the reversion and immediate possession. While two agreements were executed they were simultaneous and interdependent. They show that Dunham & Company was not willing to buy the premises without securing immediate possession, and that the Hill company not only retained the ownership of the stock and trade fixtures, but were under obligations to remove them. Trustee Hill was master of the situation, but his power could not legally be used to further his own interests at the expense of the trust. This offer to surrender the lease was in accordance with his duty as trustee. He was not required to make such surrender, however, without compensation. To hold that he must turn over all he received on a surrender of the lease is to ignore the principle which prevents him from exploiting the trust for his own benefit. He is enjoined from taking anything that belonged to the estate, or that would have come to it in the proper management of the trust, but he is not required to give up his own property unless he has so blended or mixed it with the trust estate as to be indistinguishable. In fixing this compensation, however, he should not have acted as if he were independent of trust obligations. His co-trustee was entitled to his knowledge of the prospective purchaser's needs. He should have advised him thereof and consulted him or the *cestuis que trustent* in regard to his compensation in surrendering the lease.

This he did not do, and his whole conduct in negotiating the price of his surrender of the lease and his subsequent refusal to tell the *cestuis que trustent* the amount he was getting for such surrender, is in accord with his present insistment that that was a matter which concerned none but himself. In this insistment, as well as in his attitude toward his co-trustee, Mr. Hill erred. He may have believed that $55,000 was a fair price for the reversion and that if he got that for the estate he was entitled to get all he could for his lease. His sincerity or motive is not involved. His self-interest in the transaction made him legally incapable to act as a judge. In *Creveling* v. *Fritts, 34 N. J. Eq. (7 Stew.) 134, 136*, Vice-Chancellor Van Fleet, on the subject of the right of an executor to buy the property of the estate, said:

"If it be true that these executors have sold any portion of the testator's real estate to themselves whether they did it openly and directly, or secretly and clandestinely, by any sort of evasion or artifice—it is clear that the law will not permit them to hold it, even though it may appear they have paid more for it than it was fairly worth. The law upon this subject is settled. A trustee, whether he be called an executor, administrator, or by any other name, can, in no case, and under no circumstances, become the purchaser of the property he is entrusted to sell, so as to acquire a title which he can maintain against his *cestui que trust.* The ground upon which this disqualification of the trustee rests is no other than that principle which declares that the same person cannot be both judge and party. *2 Sugd. Vend. & P. 888.* A trustee to sell is always charged with the duty of deciding several important questions—as, for example, When is the best time to sell? What steps are necessary to be taken to secure an advantageous sale? And what is a fair price for the thing to be sold? Now, if he is permitted to bring to the decision of these questions the self-interest and bias of a purchaser, is it likely that the interests of the *cestui que trust* will be as carefully considered and as sedulously protected as if he stands stripped of all bias which can in any way antagonize the interests of his *cestui que trust?* The law declares that human nature is too weak and selfish to permit even the best men to be judges in their own causes, and it therefore says that he that is entrusted with the interest of others cannot be allowed to make the business an object of interest to himself; because, from the frailty of human nature, one who has the power will be too readily seized with the inclination to use the opportunity for serving his own interest at the expense of those for whom he is entrusted. He who undertakes to act for another in any matter, cannot, in the same matter, act for himself.

"The situation of the trustee gives him an opportunity of knowing the value of the property, and also the necessities and straits of the *cestui que trust,* and as he acquires that knowledge at the expense of the *cestui que trust,* the law requires him to use it for the benefit of the *cestui que trust,* and not to his harm.

"The rule is now universal, that, no matter how fair the purchase by the trustee may be, nor how ample the consideration he

pays, the *cestui que trust* is at liberty in every case to set the sale aside. Because, if a trustee were permitted to buy in an honest case, he might likewise buy in a case having that appearance, but which, from the infirmity of human testimony, might be grossly otherwise. Thus, a trustee for the sale of land may, by the knowledge he acquires in the performance of his duty, ascertain that the land has an extraordinary latent value; as, for example, that it contains a deposit of valuable minerals, or some other hidden treasure, and, locking up that knowledge in his own breast, he might purchase the land for what might seem a fabulous price, and yet get it for a mere tithe of its real value. Now, in such case, if the trustee should choose to deny the fact of knowledge, how would it be possible to establish it against him? *Lev. Trusts 429, 461, 462.* I think it may be regarded as unquestionably true that a trustee who would enter upon the accomplishment of such a scheme would be equal to the task of concealing the real motive which induced him to purchase. Adequate protection can only be given to the *cestui que trust* by elevating the trustee to a region where temptation never comes, and if he descends, to take from him whatever of the trust property may be found in his grasp which he cannot show, by satisfactory proof, that he obtained without any violation of the great principles which should govern his conduct." ·

In the cited case the attack on the executor's conduct related to the purchase by them of their testator's property. The question decided, however, is indistinguishable in principle from that now being considered. All that was said in that case, with but slight paraphrasing, is as pertinent in the present case as in that Mr. Hill should not have entered upon the negotiations with Dunham & Company at all. Or if, by his dual relation to the subject-matter, it became necessary or advisable that he should act, he should have called in not only his co-trustee but the *cestui que trustent* and frankly laid the whole matter before them, insisting that they should act with him throughout the entire negotiations.

Such knowledge would have put the co-trustee and the *cestuis que trustent* to the inquiry whether the estate was getting its due share of the $75,000 which Dunham & Company was ready to pay

for the reversion and possession, or whether, if the purchaser had been induced to give $20,000 for the use of the premises for three years, it could not have been prevailed upon to give more than $55,000 for the reversion itself. This was not done; and the accountant Hill having taken the very opposite course, viz., carried on the negotiations himself, and in such a way that they and the result were hidden from his co-trustee and the *cestuis que trustent,* and appropriated all the moneys payable under the agreement relating to the surrender of the premises, must account for as much thereof as cannot be shown to be a proper reimbursement for the losses incurred in such surrender.

This conclusion is in harmony with the decisions defining the duties of trustees in matters where their personal interest come into conflict with the interests of the estate. In addition to the New Jersey cases already cited, see *Wyckoff* v. *Wyckoff, 44 N. J. Eq.* (17 *Stew.*) 56; *Blauvelt* v. *Ackerman, 20 N. J. Eq.* (5 C. E. Gr.) 141; *Trenton Banking Co.* v. *Woodruff, 2 N. J. Eq.* (1 Gr. Ch.) 117; *Ellicott* v. *Chamberlain, 38 N. J. Eq.* (11 *Stew.*) 604; *McCulloch* v. *Tomkins, 62 N. J. Eq.* (17 *Dick.*) 262.

For other cases, see *Jarrett* v. *Johnson, 116 Ill. App. 592; Sloo* v. *Law, 3 Blatchf. C. C. 459; Farley* v. *St. Paul Railway Co., 4 McCra. 138; Mason* v. *Martin, 4 Md. 124; Parshall's Appeal, 65 Pa. St. 224; Cogbill* v. *Boyd, 77 Va. 450; Ames* v. *Downing, 1 Bradf. (N. Y.) 321; Manning* v. *Manning, 1 Johns. Ch. 527; Sherman* v. *White, 62 Ill. App. 271; Woolf* v. *Barnes, 93 N. Y. Supp. 219; Ex parte Bennett, 10 Ves. Ch. 381; Docker* v. *Somes, 2 Myl. & K. 655; Gubbins* v. *Creed, 2 Sch. & L. 212; Bentley* v. *Craven, 18 Beav. 75, Ex parte Andrews, 2 Rose B. Cas. 410; Hamilton* v. *Wright, 9 Cl. & F. 111; Middleton* v. *Spicer, 1 Brown Ch. C. 186; Ellis* v. *Barker, L. R. 7 Ch. 104; Williams* v. *Stevens, L. R. 1 P. C. App. 352; Sugden* v. *Crossland, 3 Sm. & G. 192; Townend* v. *Townend, 1 Gif. 201; Armstrong* v. *Armstrong, 7 L. R. Ir. Ch. 207; Keech* v. *Sanford, 3 Eq. Cas. Abr. 741.*

Trustee Hill being entitled only to a reimbursement or compensation for the losses actually incurred by him in surrendering his lease and removal from the premises, the only question is, how

much of the $19,500 obtained by him from the purchaser should be returned to the estate?

After both sides had rested, the court having taken the matter under consideration, advised both parties that the testimony in certain particulars, including value of goods used by the Hill company in the business, was too meagre to assist the court in ascertaining the amount to which the company was entitled on surrender of its lease. More testimony was thereupon furnished, with but little better results.

The burden on this inquiry was on the accountant, and if the figures accepted by the court in the discharge of this duty are less than they should be, the blame rests on the accountant, for failure to prove the extent of the loss incurred.

How much will it take to adequately reimburse this company for surrendering its lease and removing from the premises? What is the value of the leasehold? It cost the lessee $2,000 a year. He did not lease another place and remove his business there. Therefore, the cost of a lease at another place as satisfactory from a business standpoint is beyond our cognizance. He abandoned all the departments other than the baking business, selling, with few and trifling exceptions, the stock and trade fixtures employed therein. He retained and removed the baking plant to a place purchased by him, where he has since conducted it on an enlarged scale, using additional capital for such purpose.

In the matter of profits the company seems to have lost nothing by abandoning some part of its business and removing the other to another place. The testimony shows that the baking business was the most profitable, and that the yearly profits of all the company's business for the last three years before the agreement to sell was made, averaged $6,000. This seems to have been the profit of the baking business at the new place at the beginning, becoming larger thereafter year by year, reaching as high as $10,000 the last year. The testimony of trustee Hill is that the bakery at the new place netted between $5,000 and $7,000 the first year, and between $10,000 and $12,000 the last year. While these profits for this business were undoubtedly due in part to the increased capital employed in its prosecution, it does not appear how much is due to that and how much to the energy and skill

then applied exclusively to the baking business. The extra capital employed in presecuting this business at the new place is said to amount to $15,000. Whether this amount was put in the first year or at any one time, does not appear. It was in the power of accountant Hill to give definite information on this head, as on some others, but it was not forthcoming. The presumption is that he has given all the evidence that makes in his favor, and in the absence of clear evidence to the contrary, the inference is justified that in the abandonment of the less profitable, and the continuance at the new place of the more profitable business, resulted in no substantial loss. Accountant Hill testified that $2,000 loss was incurred during the six months which ensued between the making and consummating of the agreements of sale, during which time one after another of the several departments of business was abandoned. Some loss was incurred in disposing of the machinery, fixtures and property used in the business so abandoned. His testimony on the value of the property employed in the Broad street place of business is not convincing. He testified that such property was worth from $20,000 to $25,000 as a going business. I have not been able to determine to my satisfaction, from the testimony, how much it would cost to replace such property. The inventory shows that the time Mr. Hill bought the interest of the testator in said premises, the machinery and fixtures were valued at $2,500, the stock of merchandise at $2,-000, and the horses and wagons at $1,200. Undoubtedly, each of these classes of goods was increased in number, and others added, and that the value of the whole property employed in the business at the time Mr. Hill agreed to surrender the lease, was considerably more than when he began as sole trader, but how much more is not satisfactorily established. The assessed valuation for taxation of this property in the year 1904, as shown by trustee Hill, during which year such stock of goods were, presumably, the largest, and as valuable as when dismantled, was $2,000, about ten per cent. of the value put upon them by Mr. Hill. Unquestionably, goods of this character are more valuable when employed in a going concern than when dismantled, and sold as second-hand goods, and it would be unjust to fix their value on the basis of what was obtained for them on a sale forced by giving up the

business, but when asked to accept $20,000 as the value of the goods it is not amiss to consider other values placed upon them by the accountant. The inventory rendered gives the price he was willing to buy at in the earlier stages of the business, and the return for taxation made by him during the last year shows the value at which he asked to be taxed. Probably this last valuation reflects more the self-interest of the owner than the real value of the goods, and the same self-interest probably prompted an over-valuation when $20,000 was given as their value at the time of the sale. Trustee Hill, in giving his reasons for asking $30,000 from Dunham & Company for a sale of his lease and business, said:

"I told him (Mr. Dunham) that I thought that $30,000 would be a fair price to pay us for the vacation of the lease, which at the profit we had been making at $6,000 a year was $18,000, and that the property we had there he could have himself, and everything except the books."

At this time his purpose was to sell to Dunham & Company all his stock, good will, &c., and the inference is that $12,000 represented his idea of the value of the stock and trade fixtures. It is also to be noted that at the end of the negotiations, the price to be paid to Hill & Company was $20,000, and that nothing but the surrender of the lease passed to Dunham & Company for said sum. True, trustee Hill testified that Dunham & Company had the right to take any of the goods it wanted. The written agreement states otherwise. It is unbelievable that as sagacious a business man as Mr. Dunham would not have availed himself of the opportunity of taking the goods which subsequently netted Mr. Hill several thousands of dollars, if, under the agreement, he was entitled thereto. The fact that Dunham & Company had no use for such goods in its business would not prevent its selling them, and thus reducing by the amount realized therefrom the sum they had agreed to pay to get rid of Hill & Company's rights in the premises. The conclusion is irresistible that the written agreement requiring Hill & Company to remove all goods from the premises gives the true situation, and the further inference is justified that $10,000, the difference between the sum asked for by Hill & Company when a sale of all was contemplated, and

that obtained when the sale of the goods and trade fixtures was eliminated from the transfers, represents Mr. Hill's idea of the value of such goods and fixtures.

In other parts of his testimony he gave an estimate of from $6,000 to $10,000 as the cost to replace the goods that Dunham & Company was at liberty to take. It is not clear just what lines of goods Mr. Hill here intended to include, but his leeway is so great that the estimate is worthless in ascertaining values.

Under the stress of such evidence and manifest self-interest, any estimate of the value of the goods employed in Hill & Company's business is largely a guess. Just why trustee Hill should leave this branch of the inquiry so barren of definite information, in view of the intimation given by the court at the time it asked for additional facts, is difficult to understand, except on the theory that it was to his interest to so leave it. If the actual value of the goods, irrespective of their being a part of a going and profitable business, were the question to be determined, a much less sum than $10,000 would be accepted, but as the good will of a profitable business has a value, it is but just, and not at all illogical, to take such increment into consideration in fixing the value of the goods with which it is necessarily connected, when, as in a case like the one now being considered, such increment will depreciate in value, if it does not become entirely value-less, upon a dismantling of a plant in the profitable running of which such increment had its origin and development. I have, therefore, concluded to accept the sum of $10,000 as a justifiable estimate of the value of such goods to such company at the time trustee Hill agreed to surrender the lease. The evidence shows that when the dismantling took place some of the goods were taken by Dunham & Company, others by Hill & Company to its new place of business, and the remainder was sold. Dunham & Company took some of the show cases and candy fixtures, but just how many is not proven; however, the inference that the value thereof was trifling, is justified, and I have estimated this value at $200. Hill & Company took with it the horses, delivery wagons and some of the baking equipment. Trustee Hill estimated the value of the baking equipment, outside of the horses, &c., at about $1,000. No value is placed on the excepted equip-

ment. At the time he purchased the interest of his deceased partner, the inventoried value of the horses and wagons was $1,200, and the Hill company should be charged with at least that amount for such property.

On this basis accountant Hill should be charged with $12,500 of the $19,500 received of Dunham & Company on the surrender of the lease, &c., in addition to that already accounted for, as per the following tabulation:

*Dr.*

| | |
|---|---:|
| Amount received from Dunham & Company.... | $19,500 00 |
| Value of goods retained, part of baking equipment, horses, wagons, &c.................. | 2,200 00 |
| Cash received for goods sold.................. | 3,200 00 |
| | $24,900 00 |

*Cr.*

| | |
|---|---:|
| Value of entire equipment as a going concern.. | $10,000 00 |
| Loss during last six months' business.......... | 2,000 00 |
| Amount paid tenant to surrender sub-lease.... | 200 00 |
| Estimated value of goods taken by Dunham & Company .............................. | 200 00 |
| | $12,400 00 |
| Amount to be surcharged.............. | $12,500 00 |

The conclusions filed, by an error, make the amount of the surcharge $12,000 instead of as above. Such conclusion, as well as the decree founded thereon, should be corrected in this particular.

The question as to the proportionate share of such surcharge to be borne by each of the accountants, is reserved for future determination, either having leave to apply to fix said share.